UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

KAMILAH BROCK,

                                    Plaintiff,                                    **15 CV 1832 (VSB)**

                    -against-                                          **PLAINTIFF'S EXPERT
                                                                        DISCLOSURES PURSUANT
                                                                        TO 26(a)(2)(B)**

THE CITY OF NEW YORK, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, HARLEM HOSPITAL, DR.
ELISABETH LESCOUFLAIR, Individually and in her Official
Capacity, DR. ZANA DOBROSHI, Individually and in her Official
Capacity, DR. ALAN DUDLEY LABOR, Individually and in his
Official Capacity, and POLICE OFFICER SALVADOR DIAZ,
Shield No. 21953, Individually and in his Official Capacity,

                                    Defendants.

--------------------------------------------------------------------------------X

        PLEASE TAKE NOTICE that Plaintiff, KAMILAH BROCK by her attorneys THE LAW

OFFICES OF MICHAEL S. LAMONSOFF, PLLC, pursuant to Federal Rule of Civil Procedure

26(a)(2)(b), hereby exchanges the following information regarding, DOCTOR ROY LUBIT, an

expert in the field of psychiatry and neurology, child and adolescent psychiatry, and forensic

psychiatry, whom Plaintiff may call at the time of trial to testify:

        Dr. Lubit's Report is annexed hereto as Exhibit "**A.**"  Dr. Lubit's fee schedule is included
        therein.

        Dr. Lubit's *Curriculum Vitae*, including publications, is attached hereto as Exhibit "**B**"

        Dr. Lubit's prior testimony is listed and attached hereto as Exhibit "**C**"

        The substances of the facts and opinions upon which Dr. Lubit is to testify are set forth in

his report, annexed hereto, and include any findings and evidence presented up to and including

1

the time of trial.  Plaintiff reserves the right to obtain a supplemental report based on further

discovery in this case.

The grounds of the opinions and testimony of Dr. Lubit will be based on Dr. Lubit's

education, training and expertise, those grounds set forth in any report, and a review of the pleadings,

testimony provided at depositions, public records and/or all discovery in this matter.

Dated: New York, New York
        September 9, 2016


                                          Yours, etc.,


                                                  /S
                               By:    JESSICA MASSIMI
                                      THE  LAW  OFFICES  OF  MICHAEL  S.
                                      LAMONSOFF, PLLC
                                      *Attorneys for Plaintiff*
                                      Junior Golding
                                      32 Old Slip, 8th Floor
                                      New York, New York 10005
                                      (212) 962-1020


TO:     THE NEW YORK CITY LAW DEPARTMENT
        *Attorneys for the Defendants*
        100 Church Street
        New York, NY 10007
        Attention: Joshua Lax, Senior Counsel

                                      2

# Exhibit A




# Roy Lubit MD, Ph.D.

165 West End Ave 3K
New York, NY 10023

roylubit@rcn.com
917-846-7829

Board Certifications
Psychiatry and Neurology
Child & Adolescent Psychiatry
Forensic Psychiatry

September 8, 2016

## Background Information

I was asked by Ms. Brock's lawyer to do an evaluation of the appropriateness and impact on her, of her hospitalization at Harlem Hospital in September 2014.

I am a psychiatrist board certified in Psychiatry and Neurology, board certified in Child and Adolescent Psychiatry and board certified in Forensic Psychiatry. I have written and lectured on psychiatric ethics.

I am charging $400 an hour for all work in the case other than deposition and trial testimony which is billed $3500 for a half day.

## Sources of Information

- Harlem Hospital Records
- Deposition of Dr. Dobroshi
- Deposition of Dr. Anderson
- Deposition of Dr. Labor
- Deposition of Dr. Nnandi
- Deposition of Dr. Lescouflair
- Interview of Ms. Brock
- Deposition of Ms. Brock

## Executive Summary

The evidence contained in the hospital record does not provide adequate justification for Ms. Brock being given injections of antipsychotic medication against her will, and does not provide adequate justification for her being committed to the hospital. The depositions of Drs. Dobroshi, Nnandi, Lescouflair, Labor and Anderson also do not provide adequate justification for either forcing medication or commitment. The various doctors in the case used terms such as "paranoia," "psychosis," "grandiose" and "manic" to justify their actions. However, the hospital record and their depositions

showed that they were using the terms inappropriately.  Contrary to what the doctors said and wrote, Ms. Brock, believing that she was being held in the hospital by coercion, was not paranoid, it was fact.  Ms. Brock believing that one did not need a college degree to be a banker and that President Obama was one of her followers on Twitter were not grandiose, they are true.  Terms such as agitated and threatening were used often without clarification as to what it meant.  Psychiatrists need to be specific about a patient's behavior when violating their rights just as other physicians need to be specific about symptoms.  For example, it would not be adequate to say "the patient has a temperature and belly pain so we are operating."

Dr. Dobroshi, when reporting on why Ms. Brock was medicated with an antipsychotic medication against her will, made statements that are false and made contradictory statements.  There is strong reason for concern that she deliberately made false statements, as well as possibly accidentally making false statements as a result of not recalling what occurred.  Specifically, Dr. Dobroshi claimed that Ms. Brock was pulling patients out of their beds and that it is written in multiple notes.  There were no such notes in the chart, as there should have been in order to explain why antipsychotic medication was given to her against her will.  Dr. Dobroshi later said that Ms. Brock once went into a patient's room and was immediately stopped.  This is consistent with the hospital record.  This makes it very unlikely, however, that she could have pulled patients (plural) from their beds.  Moreover, a note dated 9/15 stated that Haldol IM was given because she was banging the door.

Interviews and assessments were often very brief and serious actions were taken without adequate information gathering or attempts at deescalating the situation.  Time was not taken to discuss what Ms. Brock was saying to see what it really meant.  Her statement she can drive without her hands only means that she sometimes, when going straight, will steady the wheel with her knee, until she needs to turn and will then use her hands.  Although ill advised and perhaps illegal, it is not a result of psychosis, delusions, or mania.

Many times when the doctors spoke about why they kept Ms. Brock in the hospital against her will and why antipsychotic medication was forced, the doctors brought up her not being cooperative and disturbing other patients.  These are not appropriate reasons for forcing medication and for commitment.

The depositions also showed a serious lack of important psychiatric knowledge.  Contrary to what doctors asserted, manic episodes do not have a 25% suicide rate, and being upset to the point the police take you to the hospital is not suicide by cop.

The lack of time spent with Ms. Brock, statements that indicate the true reason for medicating her against her will was to get her to cooperate, and serious lack of knowledge about risk factors for suicide raise questions of a serious lack of concern for Ms. Brock's rights, rather than simply a mistake.


Interview of Kamilah Brock

Ms. Brock was born on August 17, 1982 in Jamaica.  She moved to the US with her family when she was three months of age.  She has a brother four years older than herself, a sister four years younger and another sister eight years younger.  Her mother died of colon cancer in 2004.  Her father had worked for the MTA.  He is now 59.

After graduating from Cordozo High School in Queens, NY she obtained about 3 years of college credit.  For the past year she has worked at a life insurance company and is now a supervisor. Before this she worked as a banker at Astoria Bank where she would open accounts and lines of credit. She left when her story came out in the media.  Before this she had worked for Citibank for two years.

She was fired because of a customer's complaint.  Before this she was a ticketing agent at Delta Airlines. She lost this position after an argument with another worker.  Before this she had been a banker at Chase Bank.  She was fired when the market was going down.  Before that she worked at Saks for six months which she left after her mother died.

Ms. Brock denied any history of major depression.  She denied feeling seriously down for a period of days or more, and denied episodes of decreased energy, change in eating, or feeling very down.  She said she has felt sad at times.

Ms. Brock said that she has had no episodes of spending money she could not afford and no episodes of promiscuity.  She generally sleeps 5 to 7 hours a night.  She has not had episodes of decreased need for sleep and increased energy, although there were periods when she got less sleep than usual because of work.  She denies any periods when her thoughts would go faster than usual.

She denied ever being psychiatrically hospitalized.

She saw a therapist one time on the anniversary of her mother's death when she was feeling down.  She states that she did not tell staff that her uncle wanted her to see a psychiatrist because she thought that people were stealing at AIG.  Rather, her uncle suggested she leave AIG because she uncovered stealing, and suggested she see a therapist because she was feeling down on the anniversary of her mother's death.  Ms. Brock said that staff at the Hospital conflated the stories.

Ms. Brock said that she uses marijuana daily due to a car accident in 1999 which left her with a lot of back pain.

Ms. Brock said that she is not sure why the police stopped her.  She said that although she did not have her hands on the steering wheel, she had her knee against the wheel as she approached a light. She told staff that she can drive without her hands on the wheel and can even drive with her foot out the window.  She continues to feel that she can do these things and states her mother had driven this way. She will put her hands on the wheel if she needs to turn the car.  She reports that charges of possessing marijuana and endangering were dropped.

Ms. Brock denied running into the middle of the street.  When threatened with arrest she ran out of the precinct, sat on a police car and put her hands up.

She went to the police precinct saying she needed help finding the 151st precinct in order to get her car.

In the police station, feeling bored, she was pacing round, tossed her hat in the air and caught it. She pulled on the American flag to make it wave and hid under it.  A police woman told her she was behaving erratically and told her to sit down, but she did not since she felt that the police woman was not respectful to her.  The police woman then told another officer to arrest her.  Ms. Brock ran out of the station and then sat on a police car with her arms in the air.  She said she would come in and needed help, that she was trying to find her car.  The police handcuffed her.

Ms. Brock said that she was briefly in the waiting room of the ER.  She was told to take her jewelry off while she was still in handcuffs.  She was wearing rings and chains.  She tried to slip the handcuffs off and was given an injection.  She woke up to people taking off her underwear.  She fell asleep again and woke up in a different location.  She asked to call her family and called her sister.

A female doctor asked her questions, spending about 10 minutes with her and then the doctor spoke with her sisters, who wanted to take her home.  She went into her room and slammed the door. She was then given another needle.  She said she was not offered oral medication.

She walked around and peeked around.  She recalls there being a TV area, elevators, and a number of rooms.  She denies going into someone else's room.

The next day she had a roommate who talked to herself.

Two doctors met with her and asked her questions.  They did not believe she could work as a banker or on Wall Street without a college education.

She does not recall getting a third IM medication.

She said she curses alot.

She said that her father has denied saying that she was acting strangely for three months and that her sister also wrote an affidavit that the hospital misrepresented what she said.  She said that she has not had a great relationship with her father, that he is controlling.

She denied ever saying that she did not want staff to speak with her sibling lest they attack her.

She did not say that she was there for medical marijuana. She asked if she could get it in an attempt to be funny.

She took Abilify since she was told she could not leave unless she took it.

Concerning her assertion that Obama follows her on twitter, she showed me her twitter account and that he in fact follows her.  She said that she had been active on twitter supporting him during his campaign.

She denies ever having suicidal ideation or behavior.

Ms. Brock said that she did not give permission to the hospital to speak to her family members, but staff did so nonetheless.  A social worker called her sister and said that she was feeling the effect of her mother having passed away.

She was sent out on Abilify and Lithium but never filled the prescription.  The hospital did not arrange for outpatient treatment.  She was given a number to call.

She believes that her having hives and a dry scalp may have been caused by the medication.

She said that as a result of what happened she does not want to deal with police officers or doctors.   She fears that bad things will happen if she calls the police or goes to a doctor or does music. She said that she was on her way to do music when she stopped to get her car and the problems began. She has not done a music video, or written music or performed at a club since being in the hospital.  She used to perform at clubs.

She said that she tries not to think about the hospital.  The memory which bothers her the most is waking up after being given an IM medication against her will, having her clothes taken off, being in hospital garb, and not knowing if she had been touched in a sexual way.  She thinks about what happened about three times a week for five minutes.  If she sees something in the news about hospitals it brings the memories to mind.  She feels disgusted when she thinks about what happened.

She had dreams about the ambulance and hospital during the first two months after discharge but no longer does.  Her sleep and concentration have not been affected and she said that she does not have an increased startle reaction.  She is not generally on edge unless she sees police.  She initially said she was not irritable but then noted a superior had said she was too reactive. For example, she will get upset if someone mispronounces her name, but it would not have bothered her before the hospitalization.

She no longer believes that the police and doctors are there to help her.  She blames the police

4

for sending her to the hospital and for misleading the hospital about her.

Ms. Brock said that she has put a wall up. It is harder for her to feel close to people. She used to get together with friends to play cards or drink. Now she avoids going out. Friends call her to hang out but she does not go. She feels it has adversely affected her work, she is paid on commission.

Mental Status

Ms. Brock was alert and oriented to person, time and place. She was appropriately dressed and groomed. There were no abnormal movements. Her speech was goal directed, slightly rapid, there were no loose associations or tangentiality. Her mood was upbeat and her affect was appropriate, although more elevated than people generally are in the situation of an interview. She denied hallucinations and delusions. She was able to add 15 and 17 and multiple 6x4. She could recall three objects after two minutes. Concerning the ability to abstract, she knew that an apple and banana are both fruit. Her response to the proverb "people in glass houses shouldn't throw stones" was initially concrete but then became abstract.


Medical Records

Police Report dated 9/13/2014 19:45 hours stated that Kamilah Brock (DOB 8/17/82) was incoherent, inconsistent, ran to the middle of the street impeding traffic and placing herself at risk. She was taken to Harlem Hospital for evaluation.

A medical record note from 9/14/14 stated that she was erratic, grandiose, displayed psychotic behavior, had been driving without hands on wheel, family said she was increasingly illogical and wasn't sleeping. In CPEP she was reported to be delusional labile, grandiose, had grossly impaired judgment and poor impulse control.

Medical record note of 9/14/14 said she was highly delusional.

Medical record note from 9/14/14 gave three stories including being pulled over for smoking and driving, driving with no hands on wheel, and driving with her foot out the window.

Her father reported that the police had picked her up for reckless driving and he had dropped her off to get her car.

She used to work for AIG. Her uncle suggested she see a psychiatrist after she complained people were stealing money to the point of large scale fraud.

A note dated September 14 asserted that she said that she did not want to talk about her sibling lest the writer go and attack her sibling.

She was reported to have had suicidal behavior over a year ago.

Early diagnosis in the ER was undersocialized conduct disorder aggressive.

A noted dated 9/14 stated that her mental status exam showed pressured speech, flight of ideas, grandiosity and paranoia.

She said she thought she was there for medical marijuana and became loud and threatening going to patients' rooms. She was given Haldol and Lorazepam.

A note dated 9/15 stated that Ms. Brock was denying thoughts of hurting self or others

The patient's sister, Stacey Ann, reportedly said that the Ms. Brock has difficulty sleeping, is always in a manic state, has racy thoughts, elevated mood and risky behavior.

A note dated 9/15 stated that Haldol IM was given because she was banging the door.

A medical record note dated 9/15 stated she was threatening and paranoid.

A noted dated 9/17 reported that she said that pot helps her calm down

Diagnosis of severe manic episode with psychotic features on September 20, 2014.

A note dated 9/22 reported that she had poor sleep, high energy, racing thoughts. Lithium and Abilify were prescribed.


Defendant's Initial Disclosures


Notice of Claim

Plaintiff was unlawfully held against her will at Harlem Hospital from September 13th until September 22, 2014. She was intentionally wrongfully diagnosed and medicated without her consent. The result was severe permanent injuries resulting in medical expenses and loss of work.


Personal Injury Claim Form

She was falsely detained and arrested without probable cause, and the police gave false information to the hospital. The claim is for severe, permanent injuries arising out of false arrest and assault.


Harlem Hospital Record Patient Plan for Post Hospital Care

Discharge September 22, 2014. Diagnosis of Bipolar I disorder, manic, severe with psychotic behavior. Plan was improvement in symptoms of racing thoughts, grandiose ideations, high risk behaviors and pressured speech.  Medication was Lithium 600 mg QHS and Abilify 15 mg daily.


Harlem Hospital Center Psychiatric Services Master Treatment Plan September 18, 2014

Symptoms: Grandiosity: Obama was following her on twitter, she did not need a degree to work in a bank. Patient laughs at times, cries at times, and says nothing is wrong with her.


Emergency Admission Note 9/14/14

Admitted for increasingly erratic, grandiose, psychotic behavior.  She was found driving without using her hands. Family said she hasn't slept and was illogical.  In CPEP she was labile, grandiose, delusional, and had impaired judgment and impulse control.


Behavioral Health 9/14/14

Had suicidal behavior over a year ago. Patient reported to be irritable, paranoid, hostile and uncooperative.

She reportedly she twice went to the precinct asking for her car and was brought to the ED and then CPEP.  She denied having a psychiatric history and said she was on unemployment.

6

Hospital record asserted that she gave three different stories concerning why she was picked up by the police including being pulled over for smoking and driving, having no hands on the wheel, and saying she could drive with her foot out window.

Her father reported that the police took her car from her because she was driving recklessly and gave her a ticket to appear in court.

Her father said she had been acting strangely for three months, he thought it might be related to Cannibas.  Her father stated that he had kicked her out two years ago for problematic behavior but allowed her to return two months prior to admission.  Her father felt she should be psychiatrically admitted.  He had driven her to the train so that she could get her car.

She used to work for AIG. Her uncle suggested she see a psychiatrist after she complained people were stealing money to the point of large scale fraud.

She was reluctant to talk about her sibling lest the writer go and attack her sibling. She said she had had a lot of college and is still in college of the US.

She stated: just because you cannot drive without your hand does not mean others cannot.

September 14 she was given Haldol and Ativan. Dr. Dobroshi wrote that the reason was that she was manic and psychotic.  The nurse said it was because she was acting erratic and agitated when seen by Dr. Dobroshi, and that she was impulsive and there was a propensity for violence.

September 14 Dr. Dobroshi wrote that she meets the standard for involuntary commitment, she is a substantial danger to self and others, her behavior is no longer tolerable to society and is likely to be ameliorated by hospital treatment, and that her complex clinical presentation requires comprehensive assessment and evaluation or a period of continuous observation.

She was given Haldol and Ativan in the CPEP to prevent her violence, going into other patients rooms and threatening, demanding behavior.

On September 14 on the Broset violence Checklist only irritability was checked off. September 15, patient denying thoughts of hurting herself or others. Patient's sister reported that Ms. Brock was progressively difficult at home, had difficulty sleeping, was always in a manic state and engaged in risky behavior. She has had racing thoughts and elevated mood most of the time in the last few months.  At one point she was in and out of the day room mumbling curse words.

A September 15 note says that she was showing impulsive behavior banging her door after learning that she cannot go home yet. Haldol and Ativan given stat.

Emergency Admission Note 9/15/14

Patient reported to be agitated, delusional, disruptive and threatening, grandiose and paranoid.

Hospital Record 9/15/14

Patient said that she was ready for discharge and did not want to remain in the hospital. Patient was irritable, argumentative, defensive and said she would not answer questions.

Hospital Record 9/16/14

Patient has not expressed suicidal ideation. Three plus ketonuria. Medicated in CPEP with Haldol and Ativan.

September 16 reported to be in good control of impulses.

Hospital Record 9/17/14

7

Patient said that mean people, liars and stealing make her angry. Staff will not know when she is angry. Marijuana helps her calm down.

Depositions

Comments on Deposition of Dr. Dobroshi

Dr. Dobroshi stated in her deposition that Ms. Brock needed to be medicated against her will because she was pulling people out of bed. However, I found no note written by Dr. Dobroshi or nurses or anyone else stating that Ms. Brock was trying to pull people out of bed. Standard care and documentation in medicine requires writing down the most important findings. The standard in medicine is that if it is not documented it will be assumed that it was not done.

It is inappropriate documentation for Dr. Dobroshi to have failed to write down the most important issue. It was inappropriate documentation for the nurses to have failed to write down the key issue, the most concerning aspect of Ms Brock's behavior. Failing to write it down raises serious questions as to whether it actually happened. The medical record only noted Ms. Brock allegedly going into a patient's room.  Research has shown that people will create false memories of an event which support their beliefs and actions. This can happen even after brief periods of time. Two years after an event, about which an individual paid only peripheral attention, and for which the individual is now being sued for their actions, the possibility of creating a false memory is very high.

Reading Dr. Dobroshi's deposition raises serious questions about why she authorized forced medication of Ms. Brock. On p. 12 of her deposition she testified "she showed to be very disorganized and belligerent, not following instructions. She expressed some delusional thinking, according to the record, and needed immediate intervention to help her calm and help her cooperate with the examination." The description is notable for what Dr. Dobroshi did not say when first asked why she medicated Ms. Brock against her will.  Dr. Dobroshi did not write that Ms. Brock posed a substantial risk of immediate harm to others or to herself as evidenced by her pulling patients from their beds.  Rather, she said Ms. Brock needed immediate intervention to help her calm and cooperate with the examination.  This is not an acceptable reason for forcing medication.

When asked if Ms. Brock ever indicated she wanted to harm herself Dr. Dobroshi said "Not directly. I did not ask her."  When asked if Ms. Brock indicated that she wanted to harm other people Dr. Dobroshi replied "She did not indicate verbally, but with her behavior....by going into their rooms and into their beds and trying to pull them out of their beds so she could get into their beds." When asked how many times she did that Dr. Dobroshi said "She was stopped immediately." If Ms. Brock was stopped immediately, as Dr. Dobroshi asserts, she could not have done it to multiple people. When asked where the information was about these incidents, Dr. Dobroshi said "It's in my notes, in other people's notes, in the nurses' notes, everywhere." However, the medical record contained no such note.  Dr. Dobroshi confabulating memories of what was in her notes and nursing notes supports the possibility she confabulated the experiences.

When shown the medical record Dr. Dobroshi acknowledged that her note stated that Ms. Brock went into patients' rooms, and did not say she was going into their beds or trying to pull them out of bed. Dr.

Dobroshi later asserted that nurses told her that Ms. Brock was pulling people from their beds. When asked which nurse told her that Ms. Brock was pulling people from their beds Dr. Dobroshi responded that she herself saw "Ms. Brock going to people's rooms. I don't remember who was the nurse exactly, but everybody was on their feet, like, what do we do?  I did not have bed for her at that time." She went on to say "it shows you that you are not in the right state of mind to go in peoples' rooms and ask to be in that bed. So, you know, that was not maybe—at the time when I wrote this, I did not think that was something additional to what I already wrote to show that she was disorganized and in need for redirection and help."  When asked how many times she saw Ms. Brock going into people's rooms Dr. Dobroshi changed her story and said "One time. We did not allow her to go more than once." Earlier she had stated that she was pulling multiple people from their beds.  On p. 29 Dr. Dobroshi said "the nurse came to me to ask me can we do something about this because she's loud, she was disturbing everybody, and we had to help her." Once again, as in the beginning, the reason presented for giving medication was not safety, it was to have her be quieter and more cooperative.

Dr. Dobroshi's description of what happened is contradictory and changed over time.  At one point she states that Ms. Brock was pulling multiple people from their beds. Then Dr. Dobroshi said that she went into a person's room once and was immediately stopped. This is an enormous difference. At another point she reports that Ms. Brock asked "to be in that bed". Asking to be in a bed and pulling someone out of it are different. There is another interesting comment that Dr. Dobroshi made, she stated that "what do we do? I did not have bed for her at that time." This suggests that Ms. Brock was tired, and inappropriately asked to be in someone's bed because she did not have her own bed. This suggests that what was actually needed was a stretcher or bed for Ms. Brock, rather than forced antipsychotic medication. Another issue is that if she only went into another person's room once and was immediately stopped, how could one know that she could not be redirected and that she would do it again.

On p. 32 Dr. Dobroshi said that Ms. Brock "was paranoid, worried that she was there by coercion, that she came only to get medical marijuana and she was held in emergency room." Ms. Brock's belief that she was held against her will was not paranoia, it was reality.

On p. 33 Dr. Dobroshi said "So aggressive and homicidal ideation is part of medical records—electronic record that is asking us how is she, does she have these thoughts or no, and the answer is 'contingent violent ideation....If I feel that you want to attack me, I'll attack you...It means that she was being violent with, you know---behaving very inappropriately with staff, with patients with everyone. So that is that....If she thought they are against her, then she's going to be aggressive. She was thinking people were taking her against her will."  The logic in Dr. Dobroshi's statements is difficult to follow. Contrary to what Dr. Dobroshi says, I find no evidence of homicidal and suicidal ideation in the record. I saw no sign in the record of threats of psychopathological "contingent violent ideation". If an individual has substantial reason to believe an attack is imminent it is not necessarily pathological to act first. Ms. Brock had great reason to be angry, she was being held against her will. Nevertheless, I saw no record of her making threats. This contradicts the suggestion that there was pathological "contingent violent ideation".  Dr. Dobroshi did not provide a reasonable argument that Ms. Brock presented a substantial threat of harm to others. Once again Dr. Dobroshi presented a different reason for forcing medication when she said Ms. Brock was, "behaving inappropriately with staff, with patients with everyone. So that is that." If the true motivating force was substantial imminent threat of violence, one would expect that Dr. Dobroshi would be focusing on that issue, rather than repeatedly coming back to the issue of her being disruptive and then making exaggerated statements about her going into patient's rooms and trying to pull them from beds, which were never written down.

It is significant that later in her deposition Dr. Dobroshi drops the issue of pulling people from their beds

9

and only notes going into their rooms. If the issue was pulling people from their beds one would expect her to keep noting this and to have written it down, rather than sometimes noting it, sometimes simply saying she went into people's rooms and sometimes just speaking about her being disruptive. On p. 46 Dr. Dobroshi stated "My recollection is that she got Haldol because she was going into people's rooms and not being redirectable and not allowing us to give her oral medication." Another problem with her explanation for forcing Haldol is that they were able to stop her, Ms. Brock only once stepped into someone's room.

Wandering into another patient's room is a common thing that disorganized patients do.

In assessing potential for violence, the most powerful factors are a history of violence, making threats, destroying things, persistent violent thoughts; psychopathy; command auditory hallucinations to attack someone; delusions of persecution/ being spied on/ conspiracy; and a combination of a major mental illness and substance abuse. There is no evidence in the hospital record that Ms. Brock presented a substantial and imminent threat of harm while in the hospital.  Hospital staff gave Ms. Brock a low score on the Broset Violence Checklist which addresses the 6 most common behaviors exhibited by inpatients that indicate a risk of violence: confusion, irritability, boisterousness, verbal and physical threats, and attacking objects.

Dr. Dobroshi, being board certified and a training director, and having served as an expert in cases, is held to a higher standard than the average physician.

Dr. Dobroshi's ability to draw appropriate inferences from data is very poor.  A training director with poor judgment who draws incorrect inferences will, at the least, fail to teach others good judgment and may actively teach them poor judgment.

<u>Comments on Dr. Lescouflair's Deposition</u>

Dr. Lescouflair stated that Ms. Brock was preoccupied with discharge.  According to her deposition, Dr. Lescouflair failed to explain to Ms. Brock that she needed to write a letter that she wanted to be discharged.  Instead Dr. Lescouflair said that all patients' rights are all over. A patient who has told a doctor she wants to be discharged is likely to feel that he or she has done all they can do to get discharged and may not realize that putting it in writing is critical. Having told a doctor she wants to be discharged, and nothing happening other than being told no, is likely to markedly upset patients. Dr. Lescouflair should also have contacted mental health legal services and asked someone to come and speak with Ms. Brock.

Dr. Lescouflair may have been able to diffuse the situation by telling Ms. Brock that she needed to put in a written request, to tell her how it would be handled, and to help her connect with the mental hygiene lawyer who would help her. Diffusing the situation would have decreased whatever need might have existed for forced medication. When a patient tells a doctor over and over she wants to leave and the doctor simply says no, the patient is likely to become agitated.

Dr. Lescouflair does not describe Ms. Brock as being in a state meeting 939 criteria for commitment. Two examples of grandiosity were given, one was that Obama followed her on Twitter and the other was that she did not need a college degree to work in a bank. Thinking that one does not need a college degree to be a banker is not grandiose.  The doctor could have quickly found out that in fact Ms. Brock is followed by Mr. Obama, if she had asked Ms. Brock to show her by going on to Twitter.

Comments on Deposition of Dr. Anderson

Dr. Anderson said in his deposition that he was the attending physician in the ER assigned to Ms. Brock's case. He made a determination that she was a risk to herself based on her being irrational, agitated, aggressive, combative and lacking insight. He said that she was rejecting every intervention without clear reason, was cursing and speaking loudly. He said that he ordered Lorazepam and Haldol about 45 minutes after she arrived. Then he agreed with statements that she came into triage at 22:00 on September 13 and was medicated at 12:12.  It is notable that Ms. Brock's estimate of the time she was there before being medicated was close to this, which suggests that she was not disorganized.

Dr. Anderson diagnosed Ms. Brock as under socialized conduct disorder aggressive type.

The first problem with Dr. Anderson's actions is that his description is vague. He does not say what she was actually doing. His strong words could mean no more than she raised her voice and refused to hand over her jewelry. If she made a verbal threat or physically threatening gesture or assaulted someone it should be specifically stated. Another problem is that aggressive and combative behavior is normally seen as a threat to others, not to oneself, although it could lead a person to place herself at risk.  It does not appear that he thought very carefully about whether her actions truly created a risk justifying forcing medication.  Once again, far more detail is needed to know if, in fact, her actions placed herself at risk. An additional problem is Dr. Anderson's diagnosing Ms. Brock as unsocialized conduct disorder. The medical record does not support this. An additional problem is that this would generally not be a basis for overriding someone's medical decision making. If someone refuses blood drawing because they are delusional and believe that it will kill them, or are hearing command auditory hallucinations telling them to refuse, or delirious and unable to understand what is happening, one can override their judgment.  Dr. Anderson does not provide adequate reasons for forcing medical evaluation, and forcing medication. Someone with an unsocialized conduct disorder is likely to not want to follow directions and is likely to be oppositional, rather than unable to understand the reasons for medical care.

Dr. Anderson said that they now do medical evaluations before psychiatric ones because there had been problems in delaying the medical evaluation. This makes sense, as long as the patient is willing to be medically examined. However, if a patient objects to a medical examination and blood drawing, has no sign of immediate medical decompensation, and refuses evaluation, it is a violation of the patient's rights to force medical procedures without first having the person declared incompetent to make medical decisions. One can force medical evaluation and treatment on someone who is incompetent to make such decisions, but you cannot do so because your current procedure is to do the medical evaluation prior to psychiatric evaluation. Moreover, one should call the family for support rather than jumping to force. It is very possible that Ms. Brock's agitation, and combativeness were iatrogenic. Forcing her to give up her jewelry and forcing a medical evaluation against her will, would lead many psychologically healthy individuals to become agitated, combative and oppositional.

His series of questions to help people decompress is not adequate. One needed to address how upsetting it is to be forced into an ER and forced to be evaluated.

Deposition of Dr. Labor

It appears that Dr. Labor felt that Ms. Brock was being evasive because she said she was picked up by the police because they did not believe she owned a BMW.  He said that she was preoccupied with leaving the hospital. When asked about evidence of dangerousness he said that she told him she had

11

driven with her foot out the window.

Dr. Labor then said that he assessed Ms. Brock to be dangerous to others because her behavior was erratic and impulsive to her peers in the room. She was argumentative with peers. She was speaking loud and fast about getting out of there. He assumes she was told to stay in a certain area and did not. She was loud, rambling, speaking a lot, unable to sit still. The behavior that Dr. Labor described does not present a sufficient threat to others justifying holding her against her will, particularly because much of her upset was a result of being held against her will.

Dr. Labor reported he only spent 15 minutes with Ms. Brock. While it would be reasonable to suspend an evaluation after 15 minutes if a patient refused to say anything, or if a patient came for voluntary admission and would be interviewed more on the floor in a few minutes by another doctor, it is generally not appropriate to have such a brief evaluation in the CPEP when the patient is not voluntary and her freedom is at stake and she is providing information. Believing she is being evasive is not sufficient reason to stop after such a brief time. Ms. Brock was not completely uncooperative. She did, in time, give a urine sample. She was giving some answers.

Dr. Labor believes that her being unable to control herself, getting into arguments with peers and not responding to verbal redirection justified forced medication. Once again, his description of her behavior is markedly vague and does not justify forcing medication. Unable to control herself is a meaningless phrase. Having an argument with a peer is not a basis for forcing medication. Maybe the other patient is the problem. Even if Ms. Brock drove the argument, it is not a basis for forcing medication, it is a basis for getting the person their own space. Not responding to verbal redirection is again very vague. There is a huge difference between repeatedly doing something dangerous and continuing to speak loudly when asked to speak more quietly. There is a difference between being told one time not to do something and being told multiple times and continuing to do it. A large issue may be that the hospital did not have a proper environment to deal with a somewhat agitated patient. It is standard to bring a patient to a quiet room to calm down before forcing medication. If a patient is violent and refuses to go to the quiet room, or in the quiet room tries to bang their head against the wall, forced medication is appropriate.

Dr. Labor feels one can medicate without a threat of harm to oneself or others.  He felt that it was appropriate to medicate Ms. Brock against her will because she was hyperactive, loud, disrupting the peace of others and not listening to verbal redirection. (p. 65).  By this criteria, one would often be allowed to forcibly medicate protestors at political events. When asked what led him to believe she posed a physical threat to others, Dr. Labor said she was being disruptive to others. (p. 65). Being disruptive does not mean someone is a threat. Walking around and being aloud does not create a threat permitting forced medication. Dr. Labor ordered Haldol after he met with her.

Dr. Labor said that Ms. Brock admitted driving fast and not following NYPD instructions. She almost had a physical altercation with a peer. She slammed doors (in CPEP), her thoughts were racing (wanting to go and to get things done). Concerning not following orders, she noted that Ms. Brock did not want to hand over her jewelry. This is not adequate reason for forcing medication.

If a patient is in such poor shape, is so dangerous, that the doctors feel she must be given antipsychotic medication against their will three days in a row, the doctors should put in papers to the court to force medication. The hospital did not do this after three episodes they felt were so serious they could force medication.

Deposition of Dr. Nnandi

Dr. Nnandi noted one should first talk to a patient to deal with the patient's agitation. Ms. Brock said that she did not want to speak about her sister lest they go and attack her. Dr. Nnandi felt she was a danger because she thought she could drive without using her hands. He said that her going to the police station and her behaving in a way that led them to take her to the hospital was suicide by proxy. Dr. Nnandi's inference is not justified. Pointing an unloaded gun at a police officer is likely suicide by proxy. Going to the police station to get her car, being agitated and brought to the hospital, is not suicide by proxy. Dr. Nnandi's way of assessing suicidality would mean that everyone the police bring in because of confused or agitated behavior would be hospitalized for suicidality.  Dr. Nnandi did not adequately discuss the issue of Ms. Brock driving without hands.  She does not report she can control the car magically.  She said that when going straight and approaching a light she steadied the car with her knees.  While this is ill advised, it is not based on psychiatric illness and it is not going to improve with medication.

Dr. Nnandi said that substance abuse is also associated with suicide risk; her unemployment is a risk factor; psychosis was a risk factor; and not having a place to stay is a risk factor.  There are many unemployed people who smoke marijuana and do not have a place to stay.  It is not standard practice to admit or commit these individuals.  The chart does not support the statement she had no place to go.  It says she was living with her father.

When he saw Ms. Brock he saw no reason to give Haldol. He does not know why another doctor forced her to take Haldol. Dr. Nnandi should have known this information in order to take appropriate care of her. Dr. Nnandi's prescribed treatment was observation in the ER. Dr. Nnadi said that acute manic episodes have a 25% suicide rate.  Dr. Nnandi is wrong. The lifetime risk (not the episode risk) of suicide for patients with bipolar disorder is 6 to 15%. Moreover, bipolar patients generally attempt suicide during depressive episodes or mixed affective episodes, not during manic episodes. (Can J Psychiatry. 2014 Mar; 59(3):120-30.

Conclusion

Committing someone to the hospital, holding them against their will, is a very serious act violating an individual's freedom.  It can be a traumatic experience to lose one's freedom and be locked up at the mercy of strangers, not knowing when one can leave.  It can also seriously interfere with the person willingness to get needed help in the future, lest they again be locked up, increasing the long term risk to themselves and others.

Forcing medication against someone's will is an even more invasive act, putting chemicals into their body with serious side effects. It is vital that doctors take the forced use of medication and commitment with great seriousness, realizing that they are doing harm in the hope of avoiding a greater harm.

The doctors at Harlem Hospital both did not use appropriate judgment when deciding to medicate Ms. Brock against her will and in holding her against her will.  Her hospital record and the depositions do not support either of these actions.  The records indicate that they spent much too little time with her before making these decisions, did not use acceptable reasons for doing so and acted with a marked disregard for her rights.

Ms. Brock is an intelligent woman with high energy.  Her high energy and childlike playfulness could lead a reasonable psychiatrist to consider the possibility of hypomania.  Appropriate interviewing,

however, indicates that high energy and childlike behavior, rather than mania, was the basis of her actions.  The hospital staff's failure to spend reasonable time gathering information before taking very serious actions, and instead jumping to conclusions and greatly exaggerating her symptoms, is inappropriate.

Hospital staff did not engage in appropriate interviewing techniques.  Staff did not take the time needed to explore things she said, to check on things that could readily be checked on.  Staff also made unreasonable inferences about her based on what she said.  Hospital staff inappropriately interpreted things she said as being grandiose and indicating mania, and paranoid.  Ms. Brock's statement that one does not need a college degree to work in a bank is not grandiose.  Her statement that she is followed on Twitter by President Obama is true.  Even if this had not been true this would be a relatively weak example of grandiosity.  It turns out, however, that it is true.  All it took to check on this claim is a cell phone and Ms. Brock's assistance in getting into her Twitter account so that she could prove her claim.  If Ms. Brock said that she was CEO of company (and looking online showed this was not true) or if she said that President Obama calls her daily for advice, these would be examples of grandiosity.  Similarly, Dr. Dobroshi was incorrect in claiming that Ms. Brock was paranoid, because she worried that she was in the hospital by coercion.  The truth is that she was in the hospital as a result of coercion.

The staff asserted that Ms. Brock gave different descriptions of why she was picked up by the police including driving without hands, driving with her foot out the window and using marijuana.  While this behavior raises concerns, discussion of it shows that it is not the result of mania or hypomania or of psychosis.  She will at times, if going straight, steady the wheel with her knee, freeing her hands.  This is chronic behavior, it is not the result of manic episodes, and it is not part of a delusional system in which she has special powers allowing her to do this.

Her being argumentative, cursing and pacing around would be evidence of a hypomanic episode for an individual who is normally reserved and well mannered.  However, many people would behave this way when very upset (as she had reason to be) when they are not in an altered state.  Regardless, by itself, it does not indicate a substantial risk of harm to self or others.

Ms. Brock provides no history of major depression and therefore bipolar disorder is ruled out.  Having only manic episodes is very unusual.  Ms. Brock's father felt she was in good enough shape to help her go to the police station to get her car.  This fact should have been a basis for asking further questions about her current functioning.

Concerning her allegedly running into the middle of the street, she provides a reasonable statement of what happened, and denied standing in the middle of the street where she could be hit by cars.

According to Ms. Brock, and the reports of people who saw her, staff spent far too little time with her to evaluate the situation prior to making decisions to hold her against her will and prior to forcing medication.

Multiple statements by doctors at the hospital are evidence of a serious lack of basic knowledge and judgment.  For example, going to the police, and behaving in a way that leads to arrest is not suicide by cop and is not an indication of suicidality.  In addition, manic episodes do not have a 25% suicide rate.

One cannot legally force medical evaluation or removal of clothing unless someone is deemed incompetent.  The hospital, however, now has a policy of medical evaluation before psychiatric evaluation.  This is reasonable if the patient agrees.  This is not, however, appropriate if the patient does not agree to the physical evaluation and removal of clothing and jewelry.  Hospital policy does not

justify violation of patient rights.  The hospital's behavior raises questions of assault as well as malpractice.

The hospital fails to document or specify the way in which Ms. Brock is a danger to herself or others.  She denied having thoughts of hurting herself or others.  There is no mention of asking key questions to evaluate the risk she presented such as whether she had ever tried to hurt herself or others and how.  There is no report of command auditory hallucinations to hurt herself or others.  There is no report of paranoid delusions that might lead someone to hurt others.  The primary indication of risk was her saying she drove without her hands, but on questioning it was readily apparent that what was occuring was not the result of a mental illness.  The hospital failed to take adequate time to investigate and evaluate the situation.  It is not acceptable to operate on someone for possible appendicitis based solely on abdominal pain.  One must ask a number of questions including the exact location, whether it is worse on palpation or rebound, and check temperature and blood work.  It is also not appropriate commit someone to the hospital without doing an adequate evaluation.  The hospital staff had adequate reason to hold Ms. Brock for an hour or two as they spoke in greater detail with her about issues that raised concerns, the hospital did not have an adequate basis for commitment.  In general, it is seen as worse in medicine to fail to ask important questions than it is to use poor judgment in one's final assessment of the available data.  The hospital staff failed to ask important questions.

Even if the hospital had been correct in holding and committing Ms. Brock, the use of forced medication was not justified.  Time and again the doctors stated in their depositions that IM medication was given because Ms. Brock was not cooperating with the evaluation or was disturbing others.  The hospital's protocol for medical evaluation prior to psychiatric evaluation, is not justification for giving IM Haldol against a patient's will.  Protocols are not more important than patients' rights.  If she was vomiting blood, at risk of imminently dying, and was deemed to be refusing medical care because of delusions or delirium, forcing treatment and/or sedating her against her will would generally be appropriate. But, when there is no reason to believe that she is at imminent medical risk, forcing IM Haldol to do an evaluation, which in the past had been done after psychiatric evaluation, is a serious violation of human rights.

Dr. Dobroshi's testimony is particularly concerning.  She initially said that Ms. Brock was medicated against her will because she was pulling other patients out of their beds.  This was not documented, however, in the chart.  If this had occurred it should have been documented.  Moreover, there should be an incident report and a report in the chart of the patient who was allegedly assaulted.  Dr. Dobroshi later changed her testimony from Ms. Brock pulling patients (plural) from their beds to her going into a patient's room one time and being immediately stopped.   If she went into another patient's room and staff was immediately able to stop her, they did not have justification for forcing IM medication.  If Ms. Brock had repeatedly tried to go into other patient's rooms despite being repeatedly stopped, more forceful measures would have been appropriate.  Such measures should have been one to one supervision, and/or placing her in a room with the door locked, not forced IM antipsychotic medication.  There is no report and was no testimony that Ms. Brock even tried to go into another patient's room a second time.  There is no report that she resisted leaving the room.  Wandering into another patient's room is a relatively common event in a psychiatric hospital and is not justification for forcing medication.  Ms. Brock denies going into another patient's room, she said she walked around and looked around.

The doctors at Harlem Hospital did not make one or two mistakes. Rather there were numerous serious mistakes.  There was a marked failure to do adequate interviews to assess the hypotheses that Ms. Brock suffered from a hypomanic or manic episode, that she was psychotic, and that she presented a

15

substantial danger to herself and/or others.  The available data strongly indicate that these assessments were never true.  It is a serious error to incorrectly interpret data to indicate someone has a serious mental illness and to hospitalize the individual against her or her will and to force medication when these violations of the patient's rights are not warranted.  It is even worse to fail to do an adequate evaluation to assess the possibilities.

Second, assuming that Dr. Dobroshi's assertion that Ms. Brock pulled people from their beds was true, there was a serious failure to adequately document what occurred.  If Ms. Brock did not pull people from their beds then Dr. Dobroshi made false statements under oath.  Dr. Dobroshi's assertion that Ms. Brock pulled multiple patients from their beds seems very unlikely given that she also testified they immediately stopped her when she first went into a patient room.  If the rooms were single then her statement becomes impossible.

Third, the diagnoses that were given of her having a conduct disorder and severe manic episode with psychosis are not supported by the descriptions given.  These diagnoses, along with claiming that she was grandiose and psychotic because she said that one does not need to have a college degree to be a banker shows a serious lack of judgment in interpreting data and formulating diagnoses.  Claiming she was grandiose and psychotic because she believed Obama followed her on Twitter, and failing to see if it was true, shows a marked lack of diligence.

Fourth, another serious failure in documentation concerned the use of vague, serious words without explaining their meaning.  She was reportedly threatening, delusional, paranoid and psychotic without any elaboration.  One must specify what is meant, i.e., what did she do that was threatening. There are crucial differences between taking a swing at someone, saying one is going to assault someone, glaring at someone, and raising one's voice.  The words paranoid and delusional are also very vague.  There is a great difference between believing that the people around you are actually Martians intent on killing you, believing that a friend or family member does not really care about you or is taking advantage of you, and believing that the doctors are overly controlling.  Given that she was called grandiose because she asserted that one does not need a college degree to be a banker or work on Wall Street, there is great reason for concern that the terms threatening and paranoid were also marked exaggerations.

The data strongly indicates that Ms. Brock was given IM medication to get her to cooperate and to be less disturbing to others, rather than for safety reasons.  A note dated 9/15 stated that Haldol IM was given because she was banging the door.  Moreover, Ms. Brock stated that she was given Haldol against her will after slamming a door.  This is not an acceptable reason for giving medication against a patient's will.  Giving medication to force a non emergent medical examination is also not an acceptable reason.

There were multiple errors of various types that were made. Dr. Nnandi thought that suicide rate was 25% for manic episodes when in fact the lifetime risk of suicide for bipolar patients is under 15% and suicide generally does not occur during the manic phase. Dr. Nnandi thought that going to the police and being disorganized is suicide by proxy. In surgery, operating unnecessarily because one does not know the signs and symptoms of appendicitis is very serious. Hospitalizing someone against their will without knowing when patients are at serious risk is very serious.

Forcing medical evaluation when there is no reasonable basis to believe the patient has a medical condition that requires immediate attention, and when the individual has not been declared incompetent to make medical decisions, and the only reason for the forced evaluation is that you have decided to do medical evaluations before psychiatric ones is a major violation of human rights. Injecting a patient with

16

Haldol against their will to do the evaluation right away compounds the wrong done to the patient.

Forcing antipsychotic medication so that the patient will not disturb others and will be more cooperative is inappropriate. Writing down vague reasons to justify forced medication rather than taking the time to clearly document the basis for saying there is an adequate risk of danger is very poor medical care.

Contributing to a patient's reasons for agitation by failing to tell the patient the process to be released and failing take steps to connect them with Mental Health Legal Services is very poor medical care and leads to iatrogenic agitation.

Not spending adequate time to calm a patient, not having a room where an agitated patient can be alone and calm down, and instead jumping to forced medication is inappropriate medical care and a violation of their human rights.

Spending time with Ms. Brock asking about her statements readily showed that she was not a danger to herself or others. One doctor wrote that she gave varying answers to why she was there including she was driving with her foot out the window, she drove without hands on the steering wheel, and using marijuana. Upon questioning Ms. Brock asserted that if the car is going straight she will sometimes steady the wheel with her knee (as many people do, although it presents a risk). She reported that she has leaned back and put her foot out the window while driving. She said that if she needs to turn the car she puts her hands on the wheel. While these behaviors create a risk, they are not the result of her being manic or delusional. She was neither manic nor hypomanic when I interviewed her. In that state, she noted she drives this way at times and feels it is reasonably safe. She does not feel that she magically controls the car and did not assert she was invulnerable to injury. Inappropriate risk taking behavior does not automatically indicate mental illness.

Ms. Brock said that the doctor conflated two different things she said about her uncle. She reported that her uncle did not recommend that she see a psychiatrist because she thought people were stealing at AIG. He suggested she leave AIG when she found financial improprieties and he recommended she speak with someone when she was feeling down on the anniversary of her mother's death.

Concerning Obama following her on twitter, she showed me her twitter account and that Obama was following her. She explained that she had been active in supporting his campaign using twitter.

While it is understandable that a reasonable psychiatrist would have as one of his hypotheses that Ms. Brock was manic when she was brought to the hospital by the police, an adequate evaluation shows that she was not suffering from bipolar disorder or another mental illness that led her to be a danger to herself or others.

Ms. Brock reports many symptoms of PTSD. She has symptoms of intrusive recollections. She thinks about what happened about three times a week for five minutes. If she sees something in the news about hospitals it brings the memories to mind. She feels disgusted when she thinks about what happened. Ms. Brock has symptoms of avoidance. She said that she tries not to think about the hospital. The memory which bothers her the most is waking up after being given an IM medication against her will, having her clothes taken off, being in hospital garb, and not knowing if she had been touched in a sexual way. She said that as a result of what happened she does not want to deal with police officers or doctors. Prior to the hospitalization her faith in doctors had suffered as a result of her mother's death. She had had yearly physical exams prior to the hospitalization but has not seen a doctor since. She fears that bad things will happen if she calls the police or goes to a doctor or does music.

17

Concerning negative changes in cognition or emotion, she has stopped doing her work on music videos and has not performed since the hospitalization.  She no longer believes that the police and doctors are there to help her.  Ms. Brock said that she has put a wall up. It is harder for her to feel close to people.  She used to get together with friends to play cards or drink.  Now she avoids going out.  Friends call her to hang out but she does not go.  She feels it has adversely affected her work, she is paid on commission.  She does not recall the third forced IM antipsychotic administration.

Concerning symptoms of hyperarousal, she initially said she was not irritable but then noted a superior had said she was too reactive.  For example, she will get upset if someone mispronounces her name, but it would not have bothered her before the hospitalization.

With the single exception of her noting only one symptom of hyperarrousal, rather than two she has sufficient symptoms of PTSD to fulfill the diagnostic criteria.  She has clearly been seriously adversely affected by the hospitalization.

Ms. Brock's reports of her symptoms have the signs of credibility.  Her reported symptoms are consistent with what one can occur as a result of her experience in the hospital.  She did not appear to be exaggerating symptoms and did not claim extreme symptoms.  Her reports about what happened in the hospital appear to, at least at times, be more accurate than what doctors reported in the depositions, such as the amount of time in the ER before she was given medicine against her will and the events preceding her being given medication against her will a second time.

Deeply concerning are the number of serious errors committed by multiple people.  Serious problems included lack of reasonable documentation, lack of psychiatric knowledge, serious errors in judgment, failure to do reasonable history taking, and lack of respect for patients' rights.  The number and breadth of problems spanning multiple doctors suggests a serious lack of training and oversight, and raises questions about the level of concern for patient welfare.

s/p Roy Lubit MD, Ph.D.

_____

Roy Lubit MD, Ph.D.

Exhibit B

## **CURRICULUM VITAE**

Roy H. Lubit MD, Ph.D.
165 West End Ave.  Suite 3K
New York, NY 10023
917-846-7829
roylubit@rcn.com

## UNDERGRADUATE EDUCATION

JUNE 1975    BA, Cornell University, Ithaca, NY.
             Academics: double major in history and chemistry.


## MEDICAL EDUCATION

June 1979    MD, New York University School of Medicine, New York, NY**.**


## POSTDOCTORAL TRAINING IN PSYCHIATRY

6/79-6/83    Psychiatry Residency, Yale University School of Medicine, New Haven.

7/83-6/85    Child Psychiatry Residency, The Children's Hospital, Boston, MA.

7/85-6/87    Advanced Psychotherapy Fellowship, Adams House, Boston, MA.

7/01-6/02    Forensic Psychiatry Fellowship, St. Vincent's Hospital, New York, NY.


## INTERNATIONAL RELATIONS
1997    Ph.D. in Political Science, GSAS, Harvard University, Cambridge.
        Dissertation explored impact of organizational learning on international
        conflict.


## CERTIFICATIONS
Diplomate, American Board of Psychiatry and Neurology
Board Certified in Psychiatry and Neurology, 1984.
Board Certified in Child and Adolescent Psychiatry, 2003 renewed 2012.
Board Certified in Forensic Psychiatry, 2003, renewed 2012.
New York State Medical License 205720-1.
National Board of Medical Examiners, 1980.

CLINICAL EXPERIENCE

1984-present   Private practice (child, adult and forensic psychiatry).

2006-2008      Clinical Faculty NYU School of Medicine, Dept of Child Psychiatry and
               Mt Sinai School of Medicine

2003-2004      Assistant Professor of Psychiatry, Mt. Sinai School of Medicine, Dept of
               Child Psychiatry

2002-2003      National Child Traumatic Stress Network, funded by SAMHSA and
               Assistant Professor of Psychiatry, Saint Vincents Hospital, NY Medical
               College, Dept of Child Psychiatry. Consortium for Effective Trauma
               Treatment, funded by NY Times Foundation
               .
2001-2002      Forensic Psychiatry Fellow, Saint Vincents Hospital, New York Medical
               College

2001           ADD and Behavioral Disorders Clinic: Child and Adult Psychiatry.

1999-2001      Sabbatical from psychiatry to work as a management consultant for
               PricewaterhouseCoopers.

1998-1999      Psychiatrist, Jewish Board of Family and Children's Services.

1997-1998      On-call work for On-Site Psychiatric Services at various hospitals
               including Metro-West Medical Center and Faulkner Hospital.

1996-1997      Vinfen Corporation-Child and adult psychiatry at Fall River State Hospital
               and Beverly Hospital.

1993-1996      Psychiatrist, on-call and locum tenens ward coverage Charles River
               Hospital, Solomon Carter Fuller and Corrigan Mental Health:.
               Different summers I went wherever there was the greatest need.  During
               the academic year I returned to my research and teaching.

1987-1992      Psychiatrist for Scoville and Schwager which placed me at various state
               hospitals they staffed including Danvers State, Northhampton State, Cape
               and the Islands, Solomon Carter Fuller.  I served as Acting Medical
               Director at Danver's State and at Cape and the Islands.  As noted above, I
               went wherever there was the greatest need, and during the academic year I
               returned to research and teaching.

<u>PUBLICATIONS</u>

<u>Book Chapters</u>

The Emotional Intelligence Response to Coping with Narcissism in the Work Place, in *The Fulfilling Workplace: The Organization's role in Achieving Individual and Organizational Health* ed. by Ron Burke and Cary Cooper, Gower Publishing 2013

Psychotropic medications and crime: The seasoning of the Prozac defense. With Michael Welner and Jada Stewart (2011) In Mozayani, A & Raymon, L. (Eds.) Handbook of Drug Interactions: A Clinical and Forensic Guide. Humana Press: New York, NY.

Ethics in Psychiatry in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 9th edition. Phil: Lippincott, Williams & Wilkins 2009.

Recognizing and Assisting Traumatized Children with Jonathan Cohen in Devine, J. *Making Your Schools Safe: Strategies to Protect Children and Promote Learning*. New York: Teacher's College Press 2007.

Assessing and Treating Traumatized Children in Hosen, Responding to Traumatized Children. Palgrave 2006.

Cognitive Therapy of Children with PTSD, IBID

Child Custody Evaluations in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Diagnosis and Treatment of Trauma on Children in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Using Emotional Intelligence To Deal With Difficult People and Organizations in Osland S. et al (eds) The Organizational Behavior Reader (7th ed) Saddle River: Prentiss Hall.

Children, Disasters, and the September 11th World Trade Center Attack (with Eth S.) in Norwood A and Ursano B (eds.) *Trauma and Disaster Response and Management*. Wash DC: APA Annual Review of Psychiatry, Volume 22, 2003.

Forensic Evaluation of Trauma Syndromes by Lubit R, Hartwell N, van Gorp WG, Eth S. in *Child and Adolescent Psychiatric Clinics of North America*. 2002 Oct; 11(4):823-57.

Ethics in Psychiatry (with S. and Ladds B.) in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 8th edition. Phil: Lippincott, Williams & Wilkins. (2004)

Office Politics (with Gordon R) in Kahn J. (ed.) *Mental Health and Productivity in the Workplace.* 2002.

Adolescent Moral Development (with Billick S.) in Rosner R. (ed.) Textbook of Adolescent Psychiatry (2003).

Juvenile Delinquency, (with Billick S.) in Rosner S. (ed.) Principles and Practice of Forensic Psychiatry (2003).

Articles

Post Concussive Syndrome in Medscape, 2016.

Borderline Personality Disorder in Medscape 2016.

Post Traumatic Stress Disorder in Children in Medscape, 2016.

Acute Stress Disorder in Medscape 2016

Oppositional Defiant Disorder in Medscape 2015

Attachment Disorders in Medscape 2015

Acute Treatment of Disaster Survivors in eMedicine World Medical Library, 2010.

Sleep Disorders. Medscape World Medical Library, 2015

Child Abuse and Neglect: Reactive Attachment Disorder.  eMedicine World Medical Library, 2009.

Review of Anxiety Disorders in eMedicine's Depression & Anxiety Feature Series, July 2006.

Impact of Trauma on Children (with Rovine D, DeFrancisci  Land Eth S.) *Journal of Psychiatric Practice* v9 #2 128-138 (March 2003).

Helping Disaster Survivors.  E-Medicine World Medical Library, 2001.

PTSD in Children.  E-Medicine World Medical Library, 2001.

Preserving Children's Protection While Enhancing Justice for Parents in Abuse and Neglect Evaluations by Lubit R., Billick S. & Pizarro R. *APPL Journal* V 30 No 2 (July 2002) pp287-290.

The Long Term Organizational Effects of Narcissistic Managers and Executives. *Academy of Management Executive*, Spring 2002.

Tacit Knowledge and Knowledge Management: The Keys to Competitive Advantage. *Organizational Dynamics, winter 2001*.

The Crimean Imbroglio. *East European Review*, August 1995.
The Effects of Drugs on Decision-Making (with Bruce Russett). *Journal of Conflict Resolution*, March 1984.

Books

Coping with Toxic Managers and Subordinates: Using Emotional Intelligence to Survive and Prosper (2003) Prentiss-Hall.

Other Publications

"Using Emotional Intelligence to Deal with Difficult Client Personnel (and Colleagues)"Consulting to Management" June 2004 v15 #2

"The tyranny of toxic managers: An emotional intelligence approach to dealing with difficult personalities" Ivey Business Journal, spring 2004

"Curbing the Tide of Islamic Radicalism in Europe" White Paper requested by CIA 1/1/04.

Psychiatrist's Role in Involuntary Hospitalization. Commentary 2.  Available at: HYPERLINK "http://www.virtualmentor.org" http://www.virtualmentor.org or HYPERLINK "http://www.ama-assn.org/ama/pub/category/11103.html" http://www.ama-assn.org/ama/pub/category/11103.html

Book Review (with Billick S.) of *Handbook of Neurodevelopmental and Genetic Disorders in Children*, edited by Sam Goldstein Ph.D. and Cecil Reynolds Ph.D. (New York: The Guildford Press, 1999) for *The Journal of Psychiatry & Law*. Book Review (with Eth S.) of *Children's Interests/Mother's Rights: The Shaping of America's Child Care Policy*, by Michel S (New Haven: Yale University: 1999) for *Psychiatry* .

Book Review of *The Big Five* by Alexander Saveliev. *MeiMO* (Journal of the Institute for International Economics and International Relations), winter 1996.

Book Review of *Hidden Illness in the White House* by Kenneth Crispell and Carlos Gomez. *Politics and the Life Sciences,* February 1991.

Seven Easy Peaces (with Catherine Perlmutter). *Children Magazine*, Rodale Press, September 1988.

<u>PRESENTATIONS</u>

Filmed for the TV Show "Unraveled" on the Bernie Crucza case. October 6, 2015; on air September 8, 2016 on Investigation Discovery Channel (of NBC)

Interviewed by Fox News concerning a father urging his son to fight another child.  May 28, 2014.

Interviewed by Muriel Alarcon of El Mercurio on PTSD. April 9, 2015.

Interviewed by CKGSB Knowledge, a journal of the Cheung Kong Graduate School of Business in Beijing on narcissistic managers April 11, 2014.

Quoted in "Daughter said she lied and sent dad to prison for rape, but DA upholds conviction" 16 Dec 2013 by Dan Slepian

"Post Traumatic Stress Disorder" Emergency Medicine Conference Abu Dhabi Dec 8, 2013

Interviewed by Gulf News concerning Difficult Managers. February 26, 2013.

Interviewed by Kevin Hilliker of Wall Street Journal on suicide rates in NYC schools July 2013.

Interviewed by Catherine Langley of Aquarius (aquarius.ae), on Difficult Managers, February 2013.

Canadian Broadcasting Company, interviewed by 5 of their radio stations concerning collapse of shopping mall in Ontario June 27, 2012

Interviewed by Pittsburg Post-Gazette May 11, 2012, http://www.post-gazette.com/pg/12071/1215971-455.stm

Interviewed by NY Daily News May 9, 2012,

http://www.nydailynews.com/new-york/bronx-girl-11-texts-pals-hangs-room-article-1.1074849

Quoted in Mens Health about sexual abuse November 2011.

Interviewed by Michelle Murillo Reporter FM News New York on Sandusky Sex Abuse Scandal November 10, 2011

Quoted in Wall Street Journal by Michael Rothfeld "Stanford Says He Lost His Memory" September 15, 2011.

Interviewed by Kevin Maurer of Star News on sexual abuse of children, June 19, 2011

Interviewed Pittsburg Post Gazzette on Acute Stress Disorder March 10, 2010

Assessing Forensic Evaluations, CME talk to Nassau County Bar Association 12/15/2010

Interview on Parental Alienation by Sarah Wallace of ABC Television 11/30/2010

Canadian Broadcasting Company, interviewed on television concerning Chilean Mining Disaster: August 24, 2010

Canadian Broadcasting Company, interviewed by 8 of their radio stations concerning Chilean Mining Disaster: August 24, 2010

Quoted in The McChrystal Effect: Mouthing Off To Your Boss Can Get You Fired: on ABCnews.com June 24, 2010  HYPERLINK

"http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015&page=2" \t "_blank"
http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015&page=2

Interviewed by Dow Jones concerning authoritarian managers. April 7, 2010

Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2010

Lectures on Psychiatry for Navy Physicians (ADHD, PTSD, Forensic Psychiatry, Ethics in Psychiatry, Clinical Assessment of Children, Severe Personality Disorders), Columbia, Missouri October 11 and 12, 2009.

Use of Narratives and Storytelling in Treating PTSD, Trauma Psychiatry & Psychology, International Center For Psychosocial Trauma, Columbia, MO September 30, 2009

Lectures on Ethics to Child Psychiatry Fellows, Einstein School of Medicine, Winter 2009

Impact of the Lehman Crisis on People, Fox Business News, September 15, 2008

Assessing Forensic Evaluations Rose Seminar, Minneapolis September 11, 2008

Developing Emotional Intelligence Rose Seminar Minneapolis September 11, 2008

"Assessing and Dealing With Corporate Threats" at ATAP North East Chapter, 6/23/08.

"Family Courts and Child Custody: A System Needing Change: Zigler Center at Yale April 11, 2008.

"Sex Abuse Evaluations" Symposium sponsored by Children and Family Law Committee of the Bar Association of the City of NY, January 23, 2008.

"Experiencing the Trauma of 9/11 and Understanding the Recovery" University of Missouri-Columbia International Center for Psychosocial Trauma" St Louis 6/29/06.

"Doing Forensic Evaluations" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Doing Forensic Evaluations" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Assessing and Treating Emotional Trauma" at International Academy of Law and
    Mental Health; Paris July 2005.

"Assessing Sexual Abuse Allegations" at International Academy of Law and Mental
    Health; Paris July 2005.

"New Thoughts on Leadership Development" at Society of Human Resource
    Management annual national meeting; San Diego June 20, 2005

"Dealing w. Toxic Managers" at NJ OD Network; Sharing Day; May 9, 2005
    Problems in the Child Custody System on Dateline NBC April 15, 2005

"Group Dynamics and Decision Disasters" at annual meeting of In2In Thinking Network:
    Los Angeles, April 9, 2005

"Assessment of Dangerousness" Hudson River Psychiatric Hospital February 2, 2005

"Improving the Quality of Evaluations for Sexual Abuse" Queens ACS lawyers; 1/10/05.

"Improving the Quality of Child Custody Decisions " The Second National Battered
    Mother's Custody Conference; Albany; January 8, 2005.

"Evaluating Forensic Child Custody Evaluations" to Women's Bar Association of the
    State of New York; June 8, 2003; Brooklyn, NY.

"Assessing Dangerousness" Grand Rounds at Hudson River Psychiatric Center 4/7/04.

"Radical Islam in Europe: Ideological, Psychological and Political Foundations and
    Potential Responses" invited presentation to Workshop on Radical Islam in Europe
    sponsored by CIA Office of Russian and European Analysis; McLean, VA 12/12/03

"Rethinking the Role of Psychology in Understanding Terrorism" invited presentation to
    Psychology of Terrorism Workshop sponsored by CIA Counterterrorism Center,
    Office of Terrorism Analysis; McLean, VA Nov 21, 2003.

"Assessment and Treatment of Traumatized Children" Grand Rounds MSSM Pediatrics
    Nov 20, 2003.

"Phenomenology, Psychopathology and Treatment of Emotional Trauma" Grand Rounds
    Walter Reed Army Hospital, Nov 19, 2003.

"Assessment and Treatment of Traumatized Children" Grand Rounds Pediatrics Elmhurst
    Hospital Nov 17, 2003.

With John Kastan "Organization of Disaster Mental Health Services in Post 9/11 New
    York City" Annual Meeting of APHA, San Francisco, November 15-19, 2003

"Doing Child Custody Evaluations" Bronx 18B Lawyers Retreat; Nov 2003.

"Parental Alienation Syndrome" Bronx 18B Lawyers Retreat; Nov 2003.

"Wide Ranging Impact of Emotional Trauma on Children"; William Allanson White
    Psychoanalytic Institute Sept 25, 2003

"Violence in the Workplace" UPN 9, 7/25/03.

"Terrorism" Chair of Panel, International Society of Political Psychology; Boston July 8,
    2003.

"Mind of the Modern Day Terrorist" Paper Panel on Understanding Terrorism at the International Society of Political Psychology; Boston July 8, 2003.

"Limiting the Trauma of Terrorism" Paper Panel on Political Violence and Trauma at the International Society of Political Psychology Boston; July 8, 2003.

"Children and Disasters" American Psychiatric Association, San Francisco, May 20, 2003.

"Treatment of Trauma" Grand Rounds, Hudson River Psychiatric Institute, 4/23/2003.

"Evaluation and Treatment of Children After Disasters" at Families, Trauma and Forensic Psychiatry Symposium at Walter Reed Army Hospital, April 16, 2003

"Children and Disasters" Maryland APA, April 9, 2003.

"Ethics in Psychiatry" Grand Rounds, Hudson River Psychiatric Institute, 2/26/2003.

Chair of panel on "Biological and Chemical Terrorism" at John Jay College's symposium on Homeland Security After 9/11.  January 23, 2003.

"Assessment and Treatment of Traumatized Children", Children's National Medical Center, Dec 11, 2002.

"Children's Needs and Obstacles to Meeting Them After Disasters", LA Child Development Center. November 23, 2002

"School Based Mental Health Screening" International Society of Traumatic Stress Studies November 10, 2002

"Assessment of Traumatized Children and Adolescents" International Society of Traumatic Stress Studies November 7, 2002

"Suicide and Suicide Prevention in Children and Adolescents" Safehorizon. Nov 5, 2002

"Fundamentalism and Terrorism" Group for the Advancement of Psychiatry November 1, 2002

"Bereavement and Trauma: Assisting Adolescents After Loss", Covenant House, NYC October 25, 2002

"Living With Uncertainty and Violence: Helping Youth Cope With Trauma" JBFCS Symposium. Oct 7, 2002. "Treatment of Emotional Trauma" Beth Israel Hospital, 3 half-day sessions in Sept. and Oct. 2002.

"Impact of 9/11" BBC Sept 12, 2002

"Long term impact of 9/11", NPR Sept 8, 2002

"Recognizing Troubled Children" Private Schools (HALB and HAFTR) September 3, 2002.

"Recognizing Troubled Children" NYC School Nurses, August 27, 2002

"Coping with Stress in the Modern World" NY Life Insurance, August 22, 2002

"Ethics and Leadership" Brookings Institution, Washington DC July 30, 2002.

"Treatment of Children Who Lose Parents" Easthampton Camp. July 10, 2002

"Assessing the Impact Of 9/11 On Children in Schools" Meeting of NYC school psychiatrists and supervising nurses. June 28, 2002

"Impact of WTC Disaster on Firefighters" CBS Evening News May 26, 2002

"Psychological Impact of Trauma" for Montclair NJ School District. May 16, 2002

"Origins of Delinquent Behavior" at Update on Juvenile Delinquency for Society for Adolescent Psychiatry.  May 11, 2002

"Impact of Violence On Child Development and Remedial Strategies" at Conference on

"Responding to the crisis…Partnering for Violence Prevention" Summit Country Children Services. April 16, 2002

"Terrorism, Trauma and Treatment Options" for the S. Michigan branch of the International Society for the Study of Dissociation Annual Conference Livonia Michigan. April 12, 2002.

Public Radio WNYC: Interview on psychiatric impact of WTC Disaster, 1/18/02.

"Healing a Traumatized City", invited speaker at the symposium on "The Trauma of Terror in Children", Dec 1, 2001 sponsored by the Southern California Society of Child and Adolescent Psychiatry and the Southern California Psychiatric Society.

NY1 Television: 1 hour interview program on psychiatric impact of WTC Disaster, 12/19/01.

Disaster Recovery: Worked with CEOs and HR to help companies recover from Sept 11, 2001 disaster.  Also gave presentations to groups of 5 to 170 workers: First American Title, NYC, Sept. 14; Costa Kondylis, NYC, Sept 14; Credit Lyonnais, NYC Sept 21; Financial Models, NYC, Sept 21; Coalition for the Homeless. Oct 3; Sadlier Publishing Oct 4; Queller, Fisher, Dienst Oct 10; Village Voice, Oct 17; May Davis Investment Bank, Nov. 5; NY Life Nov 12; Jacqueline Onassis H.S., Oct 19; PS 89, Nov 6; H.S. of Economics and Finance Nov 14, 2001.

"Juvenile Delinquency" invited speaker, Tri-State Forensic Psychiatry Review Course, 3/2/01.

Chairman of panel on "Political Psychology and War", annual meeting of the International Society of Political Psychology, Washington, DC  6/21/85.

"Altered Metabolic States and Decision-Making", annual meeting of the International Society of Political Psychology, Toronto  6/25/84.Discussant on papers on the

"Effects of Alcohol and Drugs on Leadership Behavior", annual meeting of the International Society of Political Psychology, Toronto  6/27/84.

ORGANIZATIONAL AFFILIATIONS

| | |
|---|---|
| 2011-present | American Academy of Child and Adolescent Psychiatry |
| 2013-present | American Academy of Psychiatry and the Law |
| 2007-2011 | Consultant to Accountability Review Panel of NYC Administration for Children's Services |
| 2004-2010 | Consultant to Association of the Bar of the City of NY Children and Law Committee |
| 2005-2006 | Disaster and Trauma Issues Committee of Am Acad of Child and Adolescent Psych |
| 2006-2010 | Dept of Child Psychiatry, NYU School of Medicine |
| 2004-2010 | Dept of Psychiatry, Mt Sinai School of Medicine |
| 2004-2005 | NY State Interdisciplinary Forum on Mental Health and Family Law |
| 2004-2010 | Consultation Cadre of the School Mental Health Project of UCLA |
| 2003-present | Consortium for Research on Emotional Intelligence in Organizations |
| 2002-2004 | Senior Consultant on Psychoeducation and Program Development, Center for Social and Emotional Education ( HYPERLINK "http://www.csee.net" www.csee.net) |
| 2002-2003 | Senior Researcher, Center on Terrorism and Public Safety. John Jay College, CUNY |
| 2003-2005 | Consultant to International Relations and Terrorism Committees of the Group for the Advancement of Psychiatry |
| 2002-2004 | Manhattan Task Force to End Child Abuse and Domestic Violence |
| 2001-2003 | National Child Traumatic Stress Network |
| 2001-2003 | New York Times Consortium for Effective Trauma Treatment |
| 1985-1991 | Institute of Social and Behavioral Pathology, fellow. |
| 1981-1988 | American Psychiatric Association, member. |
| 1983-1987 | International Society of Political Psychology, member. |
| 1982- present | Yale Edward Zigler Center in Child Development and Social Policy |

AWARDS

| | |
|---|---|
| 1990-1991 | Harvard-MacArthur Scholar in International Security. |

ORGANIZATIONAL DEVELOPMENT EXPERIENCE

| | |
|---|---|
| 1999-2001 | Consulted to: Mitsubishi, Delta Airlines, PricewaterhouseCoopers, Morgan Stanley, Sadlier Publishing, First American Title, Costa Kondylis, Credit Lyonnais, Financial Models, Coalition for the Homeless. |
| 1999-2001 | Management consultant in PricewaterhouseCoopers' Strategic and Organizational Change practice. |
| 1997-1998 | Visiting Scholar at Columbia Business School, New York, NY. |
| 1997 | Ph.D. in Political Science, GSAS, Harvard University, Cambridge. Ph.D. dissertation on the role of learning and politics in organizational change. |

TEACHING EXPERIENCE

| | |
|---|---|
| 2005- | Supervisor for residents in child psychiatry, NYU School of Medicine Department of Psychiatry |
| 2003-2004 | Supervisor for residents in child psychiatry and medical students at Mount Sinai School of Medicine |
| 2001-2003 | Supervisor for residents in psychiatry at St. Vincent's Hospital. |
| 2004 | Adjunct Assistant Professor, Zicklin School of Business, New York, NY. Taught course on Managerial and Leadership Skills in the MBA program. |
| 1990-1996 | Teaching fellow at Harvard University, for International Conflicts in the Modern World, Ethics and International Relations, Europe After 1945, and The Stalin Era. |
| 1998 | Teaching assistant at Columbia Business School, for Organizational Behavior and Building the Learning Organization. |

Exhibit C

**Cases that Roy Lubit MD provided testimony in for four years preceding June 1, 2016**

- Arruda v Catholic Church Index No. 11-1-0570-03, Sexual Abuse July 16, 2013
- Braden Caldwell, ADA case 2013 USDC Eastern District of Arkansas, Western Division Case No. 3:10-CV-03118 PKH
- Berlowitz, Custody Case 12-DR-008825-Division F; Aug 19, 2014
- Campbell v Campbell; Custody Case; Index no 8434-09; September 2012
- Castro v Partners in Recovery; Deposition; Personal Injury Suit, Index no CV2013-008063; April 13, 2015
- Defreese & Mann v Officers Walder and Kreite, Lt Genardi and the State of NJ; Personal Injury Suit; Deposition Docket BERL 283 07; June 28, 2012;
- Deleon v Rockland County Correctional Facility; Deposition Personal Injury; US District Court, S NY 10 CIV 7536; July 8, 2014
- Evans v Evans; Deposition by Video, Maine, Custody Case; September 26, 2012
- Hansen v Rite Aide, Deposition and Trial Testimony; Personal Injury Case; New Jersey Docket No. L-4790-08; 2013
- Ivan v Ivan; Custody Case, Bronx Family Court; December 18, 2012
- Glisson v NYC;  Wrongful Imprisonment; Deposition;14 CIV. 1378 (JMF); December 2015 and Jan 2016
- Hahn v Bank of America; Employment Case; S.D.N.Y. Case No.: 12-cv-4151; March 2013
- Karg v Kern; Custody Case, Manhattan Index No  309367/12; January 2015
- Kelly v State of Louisiana; Imprisonment; No. 2009-14162; April 14, 2014
- Laster v Bennacer, Custody Case, Trial Testimony Brooklyn Supreme Court; May 17, 2013
- Louisiana v Timothy Dangerfield;  Murder Case-NGRI, September 2015
- Monaco Hogan, Civil Rights And Malpractice Deposition; US District Court, Eastern District of NY, CV-98-3386; February 28, 2012, April 3, 2012 Dec 17, 2012; July 11, 2013, August 21, 2013, September 17, 2013;
- Nolfi v Skelley Custody Case, Springfield MA, Court Testimony By Phone Docket no HD/5R0/40AB; Aug 27, 2015,
- Okezie v Prince George's County, MD; Personal Injury Case; 8:13-cv-00168 AW; Deposition Feb 28, 2014, trial Aug 18, 2014
- Patel v Patel; Custody Case; March 2015
- Manhattan Transfer v Bow Quon, Civil Court of the State of NY; Index 58473/2009 Housing Case; February 2012
- Rotell v Kuehnle; Hillsborough County Florida, Personal Injury, Case 01-3009; Jan 16, 2014
- Rudin v Rudin, Child Custody Case, Rockland County; Docket No 02390-13/13A; February 2014
- Schoolcraft v Jamaica Hospital, Personal Injury Case, Southern District of NY, Case No 10 CV 06005; 2014D
- Schoolcraft v. City of NY, Jamaica Hospital, etc 10 Civ 6005, Depositions fall 2015

- Swinson-Brewington; Custody Case, Brooklyn Family Court; Docket No 25760/09; Spring 2012 and January 2013
- Tigani, Julia vs School District (Nassau County), Personal Injury Suit, Docket 2008 NA015658; March 2012,
- Tomasella, IMO Estate; SOM12-00977 December 18, 2014
- US Army v Ortega, Criminal Case Trial Testimony APO AE 09226; April 1, 2013
- Valverde v FS 41-45 Tiemann Place LLC, New York, Index No 11347/08; December 1, 2014
- Wallack; Physician's License; Testimony Before LA Board of Registration; July 19, 2013
- Wang vs IBM employment, Employment Case; Deposition DOCKET NO. 11 Civ 2992(VB); December 19, 2012
- Ward v Winfield Security, Deposition; Deposition; Superior Court of NJ UNN-L-4244-10; May 16, 2014
- Whitaker v Whitaker; Custody Case, Missouri CASE NO. 11CO-DR00187; September 2015
- Whitfield Guardianship, Queens Supreme, November 2012
- Whitten v Desert Shores Villas Condominiums, Personal Injury, Deposition District Court Nevada A590309; Nov 12 and Dec 20, 2013
- Several sealed cases done for law firm of Einsenberg and Baum

1

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X

KAMILAH BROCK,

                                    Plaintiff,                        **15 CV 1832 (VSB)**

                    -against-                                         **CERTIFICATION**

THE CITY OF NEW YORK, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, HARLEM HOSPITAL, DR.
ELISABETH LESCOUFLAIR, Individually and in her Official
Capacity, DR. ZANA DOBROSHI, Individually and in her Official
Capacity, DR. ALAN DUDLEY LABOR, Individually and in his
Official Capacity, and POLICE OFFICER SALVADOR DIAZ,
Shield No. 21953, Individually and in his Official Capacity,

                                    Defendants.

-----------------------------------------------------------------------------X

    ROY LUBIT , pursuant to 28 U.S.C. § 1746, and as a physician duly licensed to practice
in the State of New York, declares under penalties of perjury, that the information contained in
the expert report for this matter, dated September 8, 2016, including all attached documents, is
true, correct, prepared and is the work product of the undersigned, and is true to the best of my
knowledge                                    and                                 information.

Roy Lubit
M.D., Ph.D.

Dated:          New York, New York
                March 21, 2017