UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X
                                           :

KAMILAH BROCK,                          :

                              :

                        Plaintiff,   :

                              :

        - against -            :

                              :

THE CITY OF NEW YORK, et al.,      :

                              :

                    Defendants.  :

                              :

--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/25/2018___

15-CV-1832 (VSB)

**OPINION & ORDER**

Appearances:
Ryan Lawlor
The Law Offices of Michael S. Lamonsoff, PLLC
New York, New York
*Counsel for Plaintiff*

Joshua J. Lax
*for* Zachary W. Carter
Corporation Counsel for the City of New York
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Plaintiff Kamilah Brock brings this action pursuant to 42 U.S.C. § 1983. Plaintiff alleges

claims of false imprisonment, violation of her right to due process, and municipal liability arising

out of her arrest under the New York State Mental Hygiene Law and subsequent hospitalization.

Before me is the motion for summary judgment filed by the City of New York, the New York

City Health and Hospitals Corporation, Harlem Hospital, Dr. Elisabeth Lescouflair, Dr. Zana

Dobroshi, Dr. Alan Dudley Labor, Dr. Herman Anderson, and Officer Salvador Diaz

(collectively, the "Defendants"). For the reasons that follow, Defendants' motion for summary

judgment is GRANTED with regard to the § 1983 claims against the New York City Health and

Hospitals Corporation and Harlem Hospital and the *Monell* claim against the City of New York, and DENIED with regard to the false imprisonment claim against Defendant Diaz and the false imprisonment and due process claims against Dr. Lescouflair, Dr. Dobroshi, Dr. Labor, and Dr. Anderson ("Defendant Doctors").

## I.      __Factual Background__[1]

On September 12, 2014, Plaintiff was subjected to a traffic stop while driving her vehicle. (*See* Pl.'s 56.1 ¶ 8.)[2]  Plaintiff's car smelled of marijuana and it was searched.  (*Id.* ¶¶ 12–13.) Subsequent to the search of her vehicle, Plaintiff was transported to the 30th Precinct.  (*Id.* ¶ 17.) At that time, however, Plaintiff did not know that she was being transported to the 30th Precinct. (*Id.*)  Although she understood that she was at a precinct once she arrived, she did not know the exact name or location of the precinct.  (*Id.*)  Plaintiff's car keys were vouchered by an officer from the 30th Precinct.  (*Id.* ¶ 23.)  Her father picked her up at the 30th Precinct, and Plaintiff was told to pick up her car the next day.  (*See id.* ¶¶ 18–19.)  Plaintiff's understanding was that her car would be at a precinct on 151st Street, (*id.* ¶ 22), which is where the 30th Precinct is located.

### A.      *Plaintiff Attempts to Retrieve Her Car*

The next day, Plaintiff came into Manhattan to retrieve her car.  (*See id.* ¶¶ 26–48.) While on this quest, Plaintiff arrived at Police Service Area 6 ("PSA 6").  (*See id.* ¶ 49.)  Upon arrival, Plaintiff asked for help finding the 151st Street Precinct.  (*Id.*)  At first, she spoke with a female police officer, explaining that she needed help finding the 151st Precinct because her car

---

[1] The facts in this section are undisputed or construed in light most favorable to Plaintiff, the non-moving party, unless otherwise noted.

[2] "Pl.'s 56.1" refers to Plaintiff's Response to Defendants' Statement Pursuant to Local Rule 56.1 and Plaintiff's Counterstatement of Fact, (Doc. 83), which responds to Defendants' statements of undisputed material fact provided in Defendants' Statement Pursuant to Local Rule 56.1, (Doc 76).

had been confiscated the day before and she was lost. (*Id.* ¶ 51.) The female officer responded that she would get someone to help her, and a male officer, Defendant Officer Diaz, came to speak with Plaintiff. (*Id.* ¶¶ 52–53).

Officer Diaz asked Plaintiff why she was looking for the 151st Street Precinct, and she told him that her car had been confiscated the day before, and that she needed to retrieve it. (*Id.* ¶ 55.) He asked for Plaintiff's name and address, and she provided this information to him. (*Id.* ¶ 56.) Officer Diaz left and came back, at which point he told Plaintiff that he did not see her car in the system. (*Id.* ¶ 58.) He then asked Plaintiff what kind of car it was, and she told him. (*Id.* ¶¶ 59–60.) He also asked for her license plate number, and when Plaintiff responded that she did not know it, Officer Diaz asked why she did not know it. (*Id.* ¶¶ 61–62.) Plaintiff responded that she did not remember it. (*Id.* ¶ 62.) When asked whether she was sure that she owned the car, Plaintiff stated that she owned the car and it was registered to her, and she also reiterated that the car was confiscated the day before at the 151st Street Station. (*Id.* ¶ 64.)

At this point, Officer Diaz left again and came back, and he asked for Plaintiff's age. (*Id.* ¶ 65.) Feeling as if the officer was badgering her, Plaintiff asked, "What does that have to do with anything?" (*Id.* ¶ 66.) In an effort to make a joke, Plaintiff then stated that a woman does not tell her age. (*Id.* ¶ 67.) Officer Diaz responded that he would be right back, and when he returned, he stated that her car was not in the system. (*Id.* ¶ 68.) Plaintiff again told him that her car had been confiscated the day before, and she asked him to call over to the precinct because she had been waiting for an hour and a half. (*Id.* ¶ 69.) Officer Diaz walked away for a third time. (*Id.* ¶ 70.)

Plaintiff began fidgeting around the precinct while she waited. (*Id.* ¶ 71.) While in the precinct, she played with (1) her hat by throwing it in the air; (2) an American flag by removing

it from its stand, dropping it and waving it around a couple of times; and (3) a traffic cone by rocking it back and forth. (*Id.* ¶¶ 72–75.) Plaintiff grew impatient, and the female officer told Plaintiff she was acting erratically and to stop. (*Id.* ¶¶ 77–78.) Plaintiff replied, "Why do you think I am acting erratic, I'm just waiting for you guys to help me find my car." (*Id.* ¶ 78; Brock Dep. Tr. 90:1-3.)[3] The female officer then told Plaintiff to stop moving. (Pl.'s 56.1 ¶ 79.)

At this point, Plaintiff's account of the incident and Officer Diaz's account of the incident diverge. Plaintiff testified at her deposition that, after the female officer told her to stop moving, Officer Diaz returned and the female officer told him to arrest Plaintiff. (Brock Dep. Tr. 90:5-9.) As he approached Plaintiff to arrest her, Plaintiff ran out of the precinct. (*Id.* at 90:11-15.) Plaintiff put her hands up and said, "Don't arrest me, you don't need to arrest me, I'm just trying to find my car." (*Id.* at 90:16-21.) According to Plaintiff, the officers did not follow her into the street. (*Id.* at 91:5-7.) Instead, Plaintiff exited the precinct and stood in front of a parked police car with her hands up, insisting that there was no need for the officers to arrest her. (*Id.* at 90:17-91:2.) She did not run past the police car into the street, as Officer Diaz indicated. (*Id.* at 91:3-7.) Plaintiff then re-entered the precinct and said, "Please don't arrest me, I will come back in the precinct, I just need help finding my car." (*Id.* at 91:9-12.) Officer Diaz put handcuffs on Plaintiff and told her to sit down. (*Id.* at 91:13-14.) When she asked why she was being arrested, Officer Diaz said that they were not arresting her, but that they just wanted her to sit and be calm, and they would take her to her car. (*Id.* at 91:16-18.)

Officer Diaz testified at his deposition to a different sequence of events. According to Officer Diaz, when Plaintiff was playing with the American flag, both he and the female officer

---

[3] "Brock Dep. Tr." refers to the Transcript of the November 17, 2015 Deposition of Kamilah Brock, which is annexed in part as Exhibit C to the Declaration of Joshua J. Lax in Support of Defendants' Motion for Partial Summary Judgment.

told Plaintiff repeatedly to leave the precinct. (Diaz Dep. Tr. 69:14-19.)[4] Plaintiff complied and walked out of the precinct. (*Id.* at 69:19-22.) Approximately five to ten minutes later, Plaintiff returned to the precinct. Officer Diaz told her to leave again. It was only after he told Plaintiff that they would arrest her that she ran out of the precinct for a second time. (*Id.* at 81:2-14.) According to Officer Diaz, Plaintiff was standing in the street in oncoming traffic, and Officer Diaz went outside to tell her to get out of the street before she got hit by a car. (*Id.* at 83:17-21.) He brought her back into the precinct and told Plaintiff to remain in the precinct and wait for an ambulance. (*Id.* at 85:12-86:20.)

### B. *Plaintiff Is Taken to the Hospital*

Plaintiff was detained at PSA 6 until an ambulance and Emergency Medical Services ("EMS") arrived at the scene. (Pl.'s 56.1 ¶¶ 88–89.) According to the Emergency Medical Technicians ("EMTs"), Plaintiff refused to answer the EMTs' questions, argued with the "PD and EMS," and was only concerned about the whereabouts of her car. (Lax Decl. Ex. G.)[5] The EMTs listed on a form under "Provider Impression" that Plaintiff had a "Behavioral Disorder." (*Id.*) Plaintiff was told that she was being taken to her car, but instead, Plaintiff was taken to an ambulance. (Pl.'s 56.1 ¶¶ 96–97.) Specifically, Plaintiff asked if she was being taken to her car in the ambulance, and an EMT told her, "yes." (*Id.* ¶ 98.) Officer Diaz rode in the ambulance to the hospital with Plaintiff, and he was the only officer in the ambulance with her. (Defs.' Resp. to Pl.'s Counterstatement ¶ 286.)[6]

---

[4] "Diaz Dep. Tr." refers to the Transcript of the February 26, 2016 Deposition of Salvador Diaz, which is annexed in part as Exhibit C to the Declaration of Ryan Lawlor in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

[5] "Lax Decl." refers to the Declaration of Joshua J. Lax in Support of Defendants' Motion for Partial Summary Judgment. (Doc. 73.)

[6] "Defs.' Resp. to Pl.'s Counterstatement" refers to Defendant's Response to Plaintiff's Counter Statement Pursuant to Local Rule 56.1. (Doc. 87.)

## C.    *Plaintiff Is Admitted for Treatment*

When Plaintiff arrived at the hospital, she sat down.  (Pl.'s 56.1 ¶ 106.)  At one point, she approached the security desk, confused by why she was in the hospital.  (*Id.* ¶ 108.)  Dr. Erin Samuels, a non-party, admitted Plaintiff to the hospital at 10:32 p.m. as an emergency admission under Mental Hygiene Law ("MHL") § 9.39.  (Lax Decl. Ex. K, at D55.)  Plaintiff recalls that an unidentified doctor walked up to her and gave her an injection, which rendered her unconscious.  (Pl.'s 56.1 ¶¶ 110–11.)  The next thing that Plaintiff remembers is waking up in a room full of doctors and someone removing her underwear.  (*Id.* ¶ 112.)  After 30 seconds, Plaintiff passed out again.  (*Id.* ¶ 113.)  Plaintiff next woke up in new clothes from the hospital.  (*Id.* ¶ 114.)

Defendant Dr. Herman Anderson, as the attending physician in the emergency department assigned to Plaintiff, conducted the initial examination of Plaintiff.  (Lax Decl. Ex. K, at D56; Pl.'s 56.1 ¶ 120.)  Dr. Anderson stated in Plaintiff's medical records that he observed her to be hyperactive, uncooperative, and disorganized.  (Pl.'s 56.1 ¶ 121.)  Dr. Anderson ordered "urinalysis urine toxicology and sedation," seeking to determine if Plaintiff was under the influence of a mood altering drug that would explain her condition.  (*Id.* ¶¶ 129–30.)  Plaintiff's toxicology was positive for cannabinoids.  (*Id.* ¶ 131.)  Dr. Anderson ordered Lorazepam and Haloperidol, as well as Sodium Chloride to address Plaintiff's hydration.  (*Id.* ¶ 132.)  Dr. Anderson testified that he treats at least three to four patients a shift who are brought by EMS to the emergency room for abnormal activity.  (*Id.* ¶ 135.)  According to Dr. Anderson, once those patients are sedated and hydrated—and if the effects of drugs or alcohol wear off—the patient can be assessed and discharged.  (*Id.*)

During Dr. Anderson's examination, Plaintiff told him that she had met with a psychiatrist some time ago, but could not recall that doctor's name.  (*Id.* ¶ 139.)  She also told

Dr. Anderson, among other things, that she would not take pills unless they were medical marijuana. (*Id.* ¶ 140.) Ultimately, Dr. Anderson determined that Plaintiff needed to be evaluated by a psychiatrist because she was irrational, agitated, and displayed aggressive behavior. (*Id.* ¶ 144; Anderson Dep. Tr. 13:3-17.)[7] Dr. Anderson sent Plaintiff for a psychiatric assessment in the Psychiatric Emergency Department ("CPEP"). (Defs.' Resp. to Pl.'s Counterstatement ¶ 301.)

On September 14, 2014, Plaintiff was transferred to CPEP. (Pl.'s 56.1 ¶ 145.) Within approximately an hour of Plaintiff's arrival at CPEP, Dr. Charles Nnadi, a non-party, performed an assessment of Plaintiff. (*Id.* ¶ 147; Lax Decl. Ex K, at D109–19.) Dr. Nnadi noted in Plaintiff's medical records that upon entering CPEP, Plaintiff caused hospital police to have to call for backup when she would not allow her property to be vouchered. (Pl.'s 56.1 ¶ 148.) Dr. Nnadi also spoke with Plaintiff's father about Plaintiff. (*See id.* ¶¶ 153–54.) Dr. Nnadi recommended that Plaintiff be admitted to CPEP for extended observation under MHL § 9.40. (Pl.'s 56.1 ¶ 172; Lax Decl. Ex. K, at D119, D124.)

On that day, Defendant Dr. Zana Dobroshi was the attending on call in CPEP. (Pl.'s 56.1 ¶ 183.) At no point during Dr. Dobroshi's examination of Plaintiff did Plaintiff indicate that she wanted to harm herself or other people. (Defs.' Resp. to Pl.'s Counterstatement ¶ 330–31.) Plaintiff told Dr. Dobroshi that she came to the hospital for a medical marijuana prescription. (Pl.'s 56.1 ¶ 184.) Plaintiff refused oral medication and was given an injection of Haldol and Ativan. (*Id.* ¶ 186.) Dr. Dobroshi also spoke with one of Plaintiff's sisters, Stacey Ann Brock. When Ms. Stacy Ann Brock was told that her sister might have bipolar disorder, she replied that

---

[7] "Anderson Dep. Tr." refers to the Transcript of the June 6, 2016 Deposition of Dr. Herman Anderson, which is annexed in part as Exhibit L to the Declaration of Joshua J. Lax in Support of Defendants' Motion for Partial Summary Judgment.

Plaintiff had certain stressors in her life, "such as issues their father was confronting and their house catching fire." (Pl.'s 56.1 ¶ 189.) When the doctor told Ms. Stacey Ann Brock that Plaintiff needed to be further evaluated, she asked if Plaintiff could be evaluated by a doctor with whom Ms. Stacey Ann Brock was familiar. (*Id.* ¶ 192.) Thereafter, Plaintiff was admitted to the Extended Observation Bed unit. (*Id.* ¶ 193.)

On September 15, 2014, Defendant Dr. Alan Dudley Labor was on call at CPEP. (Defs.' Resp. to Pl.'s Counterstatement ¶ 391.) Dr. Samuels asked Dr. Labor to provide a psychiatric evaluation of Plaintiff. (*Id.* ¶ 392.) After receiving this instruction from Dr. Samuels, it was Defendant Labor's understanding that he would make the determination of whether Plaintiff was to stay for an additional number of days or be released. (*Id.* ¶ 394.) Neither Dr. Samuels, nor any other medical staff, told Dr. Labor anything about Plaintiff before he began the evaluation, and Dr. Labor met Plaintiff for the first time on that day. (*Id.* ¶ 393.)

During the evaluation, Plaintiff was preoccupied with leaving the hospital, but this behavior did not seem abnormal to Dr. Labor. (*Id.* ¶ 414.) Dr. Labor testified at his deposition that he observed Plaintiff behaving in a way that was "kind of erratic and impulsive to her peers in the room"—namely, she was "argumentative" with "one or two patients" in the CPEP room. (*Id.* ¶ 418.) He prescribed an injection of Haldol and Attivan for Plaintiff, (*id.* ¶ 439), and he testified at his deposition that Plaintiff's behavior warranted the forced administration of Haldol because Plaintiff was unable to control herself, she was getting into verbal arguments, and she was not responding to verbal redirection, (*id.* ¶ 432). Dr. Labor was unable to diagnose Plaintiff at the end of his initial 15-minute conversation with her. (*Id.* ¶ 429.) Dr. Labor observed and met with Plaintiff again the next day, September 16, 2014. He observed that Plaintiff's condition had improved and she was calmer. (*Id.* ¶ 453.)

On September 17, 2014, Plaintiff was transferred to the Psychiatric Department. On September 18, 2014, Dr. Meenal Pathak, a non-party, completed a psychiatric assessment of Plaintiff in the presence of the attending physician, Defendant Dr. Elisabeth Lescouflair. (Pl.'s 56.1 ¶ 197.) Plaintiff told Dr. Pathak that the police pulled her over because she was driving with her feet, rather than her hands, on the steering wheel, and that the police thought she was smoking marijuana. (*Id.* ¶ 199.) She also told the doctors, among other things, that she was a singer and a rapper, she could play musical instruments without any training, she was a banker for a number of years, and President Obama followed her on Twitter. (*Id.* ¶¶ 205–06, 208, 216.) Based on her participation in the ongoing assessment of Plaintiff, Dr. Lescouflair found that Plaintiff was admitted on the account of a manic episode complicated by THC abuse with intoxication. (*Id.* ¶ 233.) She observed that Plaintiff was "talkative, argumentative, having an elated mood with a labile affect where she tends to be irritable or crying."[8] (*Id.* ¶ 240.) Dr. Lescouflair's impression was that Plaintiff suffered from "bipolar disorder manic and THC abuse." (*Id.* ¶ 244.)

On September 22, 2014, Plaintiff was discharged from the hospital. (*Id.* ¶ 247.) In total, Plaintiff was confined at Harlem Hospital for nine days, from the night of September 13 until and including September 22, 2014. After her hospitalization, Plaintiff never went for an evaluation with her own treating physician. (*Id.* ¶ 248.)

## II.    **Procedural History**

Plaintiff initiated this action by filing a complaint on March 12, 2015. (Doc. 1.) On June 2, 2015, the City, along with Defendants New York City Health and Hospitals Corporation ("HHC"), Harlem Hospital, Dr. Lescouflair, Dr. Dobroshi, and Dr. Labor answered the

---

[8] Labile means Plaintiff "would go from being elated to audible to crying, and was easily distracted." (*Id.* ¶ 241.)

complaint.  (Doc. 11.)

An initial pre-trial conference was held on July 8, 2015.  (Dkt. Entry July 8, 2015.)  A case management plan and scheduling order was entered into shortly thereafter, and the parties proceeded with discovery.[9]  (Doc. 19.)

On March 1, 2016, counsel for Plaintiff submitted a letter seeking leave to file an amended complaint to name Police Officer Salvadore Diaz as a defendant, (Doc. 43), which I granted, (Doc. 44).  On March 16, 2016, Plaintiff filed her amended complaint.  (Doc. 46.)  On November 16, 2016, Defendants the City, HHC, Harlem Hospital, Dr. Lescouflair, Dr. Dobroshi, Dr. Labor, and Officer Diaz answered the amended complaint.  (Doc. 64.)

On August 26, 2016, counsel for Plaintiff submitted a letter, on consent from the parties, seeking leave to file a second amended complaint to name Dr. Herman Anderson as a defendant, (Doc. 58), which I granted, (Doc. 60).  On August 26, 2016, Plaintiff filed her second amended complaint.  (Doc. 61.)  On November 29, 2016, Defendants answered the second amended complaint.  (Doc. 69.)

After the close of discovery, Defendants filed the instant motion for summary judgment (Doc. 72), accompanying memorandum of law, (Doc. 77), supporting declaration and exhibits, (Docs. 73–75), and Statement Pursuant to Local Rule 56.1, (Doc. 76).  On March 23, 2017, Plaintiff filed her opposition to the motion for summary judgment, (Doc. 82), supporting declaration and exhibits, (Doc. 84), and Response to Defendants' Statement Pursuant to Local Rule 56.1, and Plaintiff's Counterstatement of Fact, (Doc. 83).  On April 17, 2017, Defendants filed their reply, (Doc. 89), supporting declaration and exhibits, (Doc. 88), and Response to

---

[9] At no point did Defendants seek to move to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Plaintiff's Counterstatement Pursuant to Local Rule 56.1, (Doc. 87).

In support of her opposition to this motion, Plaintiff submitted the expert report of Dr. Roy Lubit (the "Lubit Report"), which she also disclosed during expert discovery pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). (Doc. 84-2.) Dr. Lubit is a psychiatrist board certified in Psychiatry and Neurology. (Lawlor Aff. Ex. B, at 1.)[10] In his expert report, Dr. Lubit offered a number of opinions and conclusions after having reviewed Plaintiff's hospital records, the depositions of Defendant Doctors, the deposition of Dr. Nnadi, and the deposition of Plaintiff. Dr. Lubit also interviewed Plaintiff as part of his evaluation. Defendants did not submit an expert report.

### III. Legal Standard

#### A. *Summary Judgment*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at

---

[10] "Lawlor Aff." refers to the Decalration [sic] of Ryan Lawlor in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment. (Doc. 84.)

256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citation and quotation marks omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

**B.**    *Section 1983*

Section 1983 imposes civil liability on a party who, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To prevail on a claim under § 1983, "a plaintiff must show that (1) defendants acted under 'color of state law' (2) to deprive him of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 412 (S.D.N.Y. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir. 1994)), *aff'd*, 441 F. App'x 24 (2d Cir. 2011). "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Williams v. N.Y.C. Hous. Auth.*, No. 05 Civ. 2750(DC), 2007 WL 4215876, at *5 (S.D.N.Y. Nov. 30, 2007) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

**IV.    Discussion**

Defendants move for summary judgment on the following claims alleged under § 1983: (1) the false imprisonment claim against Defendant Officer Diaz; (2) the false imprisonment and due process claims against Defendant Doctors; (3) the claims asserted against Defendants HHC and Harlem Hospital; and (4) the *Monell* claim against the City. I address each claim in turn.

**A.    *False Imprisonment Claim against Officer Diaz***

Plaintiff alleges that Officer Diaz subjected her to a false imprisonment by improperly arresting her pursuant to MHL § 9.40.

**1. Applicable Law**

For § 1983 claims for unconstitutional false arrest in New York, a plaintiff is required to show that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Probable cause "is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). Probable

cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," and "depends, in the first instance, on state law." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (citations omitted). To determine whether probable cause exists, courts consider the "'totality of the circumstances' in light of the facts known to the arresting officer at the time of the arrest." *Creighton v. City of New York*, No. 12 Civ. 7454 (PGG), 2017 WL 636415, at *25 (S.D.N.Y. Feb. 14, 2017) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . ." *Weyant*, 101 F.3d at 852.

Under MHL § 9.41, a police officer "may take into custody [and remove to a hospital] any person who appears to be mentally ill and is conducting . . . herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41. "Likely to result in serious harm" is defined as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

*Id.* § 9.01. "In assessing whether an officer had probable cause to arrest a person under this statute, courts apply the same objective reasonableness standard that governs Fourth Amendment claims." *Arroyo v. City of New York*, No. 14-CV-9953 (JPO), 2016 WL 8677162, at *3 (S.D.N.Y. July 8, 2016), *aff'd*, 683 F. App'x 73 (2d Cir. 2017).

Furthermore, qualified immunity protects an officer "so long as he had 'arguable probable cause' to arrest, which 'exists if either (a) it was objectively reasonable for the officer

to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Dancy*, 843 F.3d at 107 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "[T]o determine whether a mental-health seizure is justified by arguable probable cause, a court must review the specific observations and information available to the officers at the time of a seizure." *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016). "A person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others." *Id.* at 634.

### 2. Application

Defendants argue that Plaintiff's false imprisonment claim against Officer Diaz must fail because there was probable cause to seize Plaintiff pursuant to MHL § 9.41, or at the very least, Officer Diaz was entitled to qualified immunity because he had arguable probable cause. Because I find that there are disputed issues of material fact related to the existence of probable cause to seize Plaintiff pursuant to MHL § 9.41, Plaintiff's false imprisonment claim against Officer Diaz survives the motion for summary judgment.

Specifically, the "pertinent events" leading up to Plaintiff's arrest under MHL § 9.41 are disputed. *Weyant*, 101 F.3d at 852; *see also Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) (reversing summary judgment on qualified immunity grounds pursuant to MHL § 9.41 because of the parties' disputed accounts of the events leading to plaintiff's arrest); *Quon v. City of New York*, No. 14-cv-9909 (RJS), 2016 WL 4411416, at *4–5 (S.D.N.Y. Aug. 18, 2016) (denying summary judgment due to the parties' "significantly different accounts of [p]laintiff's arrest" and holding that "a jury must determine what transpired between the officers and [p]laintiff before the Court can make a determination as to qualified immunity"). Officer Diaz claims that both he and another female officer repeatedly asked Plaintiff to leave the

precinct.  Although Plaintiff complied initially, she kept coming back to the precinct.  After the

officers threatened to arrest Plaintiff, she ran out of the precinct a second time.  At this point,

Plaintiff was standing on the street in oncoming traffic.  It was only then that Officer Diaz

brought her back into the precinct and told her to wait for an ambulance.

Plaintiff sharply disputes Officer Diaz's account, contending that the female officer

instructed Officer Diaz to arrest Plaintiff, causing Plaintiff to run out of the precinct for the first

time.  According to Plaintiff, the officers did not follow her into the street.  Instead, Plaintiff

exited the precinct and stood in front of a parked police car with her hands up, insisting that there

was no need for the officers to arrest her.  She did not run past the police car into the street, as

Officer Diaz indicated.  Plaintiff then re-entered the precinct on her own, at which point Officer

Diaz put handcuffs on her and stated that they would take her to her car.

Given this dispute as to what Officer Diaz knew and/or observed at the time of Plaintiff's

seizure, a jury should decide what transpired between the officers and Plaintiff before I

determine whether there was probable cause (or arguable probable cause) to seize Plaintiff

pursuant to MHL § 9.41.[11]  *See Kerman*, 261 F.3d at 241.  Accordingly, Defendants' motion for

summary judgment is denied with respect to Plaintiff's false imprisonment claim.

### B.        *Claims against Defendant Doctors*

Plaintiff alleges that Defendant Doctors subjected her to a false imprisonment and

violated her right to substantive due process under the Fourteenth Amendment by involuntarily

committing her to Harlem Hospital.  She contends that Defendant Doctors' determinations and

---

[11] Defendants rely on *Krynski v. Chase*, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009), for the proposition that a plaintiff cannot create a dispute of fact by simply showing that the adverse party testified differently.  (*See* Def. Reply 8.)  Unlike *Krynski*, however, I find that the contradictory testimony here, if credited, would lead to a different legal outcome.  *See* 707 F. Supp. 2d at 322.  Therefore, the parties' disputed accounts create a "genuine" issue for trial that must be decided by a jury.  *See id.*

diagnoses under MHL §§ 9.40 and 9.39 were incorrect because they were based upon facts that do not support those determinations and diagnoses.

## 1. Applicable Law

"An involuntary confinement to a hospital constitutes a seizure within the meaning of the Fourth Amendment." *Kraft*, 696 F. Supp. 2d at 415. Such confinement is "tantamount to the infringement of being arrested." *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993). "New York's overall statutory scheme governing involuntary commitments has been held facially sufficient to meet the requirements of due process." *Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995).

Under MHL § 9.39, an individual may be admitted involuntarily pursuant to that section "only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section." N.Y. Mental Hyg. Law § 9.39(a). Section 9.39 requires not only that the individual be "alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate," but also that the patient's alleged mental illness be "likely to result in serious harm to himself or others." *Id.* "Likely to result in serious harm" is defined as a:

1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

*Id.* The patient must be given written notice of her status and rights at the time of admission, and the mental hygiene legal service must be notified. *Id.*

Under MHL § 9.40, a psychiatric emergency program can retain a person for a period of

seventy-two hours when the individual is "alleged to have a mental illness for which immediate observation, care and treatment in such program is appropriate and which is likely to result in serious harm to the person or others." *Id.* § 9.40(a). A hospital can admit an individual on that same basis and retain him for a period of fifteen days under MHL § 9.39. *Id.* § 9.39(a).

A doctor is not liable under § 1983 for the treatment decisions he or she makes unless such decisions are "such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [he or she] actually did not base the decision on such a judgment." *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). "This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference." *Id.* MHL § 9.39 "implicitly defer[s] to medical judgment," and "the statute implicitly requires that [the committing physicians'] judgment—affecting whether an individual is to be summarily deprived of her liberty—be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community." *Rodriguez*, 72 F.3d at 1063. In other words, a physician's decision to involuntarily commit a mentally ill person violates substantive due process "when the decision is based on substantive and procedural criteria that are substantially below the standards generally accepted in the medical community." *Bender v. Lowe*, No. 08 Cv. 0334(BSJ), 2011 WL 4001147, at *7 (S.D.N.Y. Aug. 31, 2011) (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir.2010)), *aff'd*, 531 F. App'x 142 (2d Cir. 2013).

"The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." *Kraft*, 696 F. Supp. 2d at 413 (quoting *Fisk v. Letterman,* 501 F. Supp. 2d 505, 522 (S.D.N.Y. 2007)). Although "the question of what the generally accepted standards

were is a question of fact," *Rodriguez*, 72 F.3d at 1063, summary judgment is appropriate in the

absence of such evidence, *see Kraft*, 696 F. Supp. 2d at 413. Mere disagreements about a

doctor's "perceptions, diagnoses, and subsequent action . . . are not sufficient to raise material

issues regarding the treatment decisions made by [the doctor]." *Id.*; *see also Kulak*, 88 F.3d at 75

(finding that plaintiff's expert's disagreement with the defendant doctors' diagnosis failed to

raise a material issue and did not constitute a determination that their diagnosis fell substantially

below accepted medical standards).

## 2. Application

Defendants argue that Plaintiff was properly evaluated and committed pursuant to

MHL §§ 9.39 and 9.40, and that Plaintiff fails to demonstrate that there was any substantial

departure from the standard of care regarding Plaintiff's hospitalization and administration of

medication.[12] Because I find that there are disputed issues of material fact, Plaintiff's false

imprisonment and due process claims against Defendant Doctors survive the motion for

summary judgment.

Defendant Doctors, along with other non-party physicians at Harlem Hospital,

determined that Plaintiff might have a mental illness that would likely result in serious harm to

others. Based on this determination, they decided to hold Plaintiff for extended observation

under MHL § 9.40 and admit Plaintiff to CPEP under MHL § 9.39. This determination on its

own, however, does not establish that Defendant Doctors complied with the MHL. *See*

---

[12] Defendants also argue that Plaintiff waived her claims against Defendant Doctors because she waived her right to challenge her hospitalization in state court. (Def. Mem. 21.) I disagree. The only case that Defendants cite in support of this argument is *Rosado v. Schneiderman*, No. 9:13-cv-1133 (GLS/ATB), 2014 WL 2763622 (N.D.N.Y. June 18, 2014). In *Rosado*, the plaintiff waived his right to a probable cause hearing pursuant to MHL § 10.06. *Id.* at *9. Rosado was informed, in open court, of his right to a probable cause hearing, and "[w]ith full knowledge of these rights, and in consultation with counsel," waived that right. *Id.* at *6. There are no facts here that even remotely resemble the waiver at issue in *Rosado*, and therefore I find it inapposite.

*Rodriguez*, 72 F.3d at 1063 (rejecting the district court's suggestion that "a physician's mere making of a finding satisfies the requirements of either the statute or due process"). Rather, the relevant question is whether Defendant Doctors departed from "the standards generally accepted in the medical community" in deciding to commit Plaintiff and treat her. *Id.*

To establish these standards and answer this question, Plaintiff introduced the expert report of Dr. Roy Lubit. *See Kraft*, 696 F. Supp. 2d at 413 ("The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." (quoting *Fisk*, 501 F. Supp. 2d at 522)). As an initial matter, I reject Defendants' argument that the Lubit Report is "hearsay without an exception" and "was not sworn under the penalty of perjury." (Def. Reply 1.) First, Defendants fail to articulate any reason whatsoever to explain why the Lubit Report is inadmissible hearsay when experts are permitted to rely on hearsay in formulating their opinions.[13] Second, Dr. Lubit signed a certification declaring, under the penalties of perjury, that his Report was true, correct, and his work product to the best of his knowledge and information. (*See* Lawlor Aff. Ex. B.)

Moreover, the Lubit Report raises an issue of triable fact. Relying on *Kulak* and *Kraft*, Defendants argue that the Lubit Report merely disagrees with the diagnosis made by Defendant Doctors and fails to articulate how the physicians substantially departed from accepted standards. Indeed, courts in this Circuit routinely dismiss "claims on summary judgment where the plaintiff's expert fails to identify the standard of care which was allegedly violated." *Schoolcraft*

---

[13] Defendants' basis for their hearsay challenge to the Lubit Report is not entirely clear. In any event, although an expert's report may not be used as a conduit for inadmissible hearsay, "an expert may rely on hearsay sources that she used in forming her opinion." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013). The Lubit Report is not inadmissible hearsay because it reflects Dr. Lubit's own opinions.

*v. City of New York*, 103 F. Supp. 3d 465, 535 (S.D.N.Y. 2015) (collecting cases). Defendants are correct that the vast majority of the statements in the Lubit Report are mere expressions of disagreement with Defendant Doctors' diagnoses and determinations, which on their own would be insufficient to create an issue of triable fact. The Lubit Report, however, can also be fairly read as articulating a standard of care. *See id.* (holding that Dr. Lubit's expert report in another case "adequately set[] out the standard of care and his opinion that [defendant doctors] substantially departed from that standard"). For example, the Lubit Report contains numerous assertions that Defendant Doctors failed to compile the information necessary to determine whether an individual should be involuntary committed. (*See, e.g.*, Lawlor Aff. Ex. B, at 14 ("Hospital staff did not engage in appropriate interviewing techniques."); *id.* at 15 ("The hospital failed to take adequate time to investigate and evaluate the situation."); *id.* at 15–16 ("There was a marked failure to do adequate interviews to assess the hypotheses that Ms. Brock suffered from a hypomanic or manic episode, that she was psychotic, and that she presented a substantial danger to herself or others."); *id.* at 16 ("[A]nother serious failure in documentation concerned the use of vague, serious words without explaining their meaning."); *id.* at 18 ("Serious problems included lack of reasonable documentation, lack of psychiatric knowledge . . . failure to do reasonable history taking . . . .").) Therefore, the Lubit Report provides a basis for a reasonable juror to determine the relevant medical standards governing involuntary admission.

Thus, it is for the jury to decide between the experts' competing testimony in order to determine the generally accepted standards that warrant a physician's order of involuntary commitment and subsequent treatment. Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiff's false imprisonment and due process claims against

Defendant Doctors.[14]

### C.       *Claims against HHC and Harlem Hospital*

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); *see also Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases). On this basis alone, I could grant summary judgment on all claims against HHC and Harlem Hospital, because Plaintiff failed to raise any argument regarding these claims in her opposition. Additionally, however, I find that Plaintiff's § 1983 claims against HHC and Harlem Hospital fail on the merits.

Vicarious liability—the only theory under which Plaintiff could proceed against HHC and Harlem Hospital—is unavailable for § 1983 claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Hofelich v. Ercole*, No. 08 Civ. 2193(PKC)(DFE), 2010 WL 102758, at *5 (S.D.N.Y. Jan. 11, 2010) (granting summary judgment for defendant because plaintiff's claim against defendant was based on theory of respondeat superior). Plaintiff has not shown HHC or Harlem Hospital's individual involvement in the alleged constitutional deprivation.

---

[14] Defendants argue in passing that Defendant Doctors are entitled to qualified immunity. (Def. Mem. 21.) Defendants' argument is unavailing. Although qualified immunity shields a defendant sued in her individual capacity "from liability for civil damages insofar as her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Rodriguez*, 72 F.3d at 1065 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), "qualified immunity does not protect an official against redress for performance that was plainly incompetent," *id.* Here, Plaintiff presented evidence from which a reasonable jury could conclude that Defendant Doctors' performances were in fact plainly incompetent. Thus, Defendant Doctors' entitlement to qualified immunity cannot properly be decided on summary judgment. *See id.*; *Ruhlmann v. Ulster Cty. Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 174 (N.D.N.Y. 2002) (denying summary judgment on qualified immunity because plaintiff "presented evidence that would call into serious question the reasonableness of defendants' conduct").

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's § 1983 claims against HHC and Harlem Hospital.

### D.    *Monell Claim against the City*

As with her § 1983 claims against HHC and Harlem Hospital, Plaintiff fails to address Defendants' argument regarding her § 1983 claim against the City in her opposition, thereby abandoning her *Monell* claim at the summary judgment stage.  *See Taylor*, 269 F. Supp. 2d at 75. Moreover, as with the claims against HHC and Harlem Hospital, Plaintiff's § 1983 claim against the City also fails on the merits.

A municipality or local government is liable under § 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted). Local governments are not vicariously liable under § 1983, and instead are responsible only for their own illegal acts.  *Id.*  "A municipality may, however, be liable under § 1983 when the alleged deprivation of constitutional rights is the result of action pursuant to an official municipal policy, or the municipality exhibits deliberate indifference to the possibility of such a constitutional violation."  *Williams v. City of New York*, 690 F. Supp. 2d 338, 343 (S.D.N.Y. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).  In addition, "the deprivation of the plaintiff's rights [must be] caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  Plaintiff offers no direct or circumstantial evidence of a municipal policy, custom, or practice on the part of the City, nor has she linked any such policy to her treatment by the officers or Defendant Doctors.  Accordingly, Defendants' motion is granted with respect to Plaintiff's § 1983 claims against the City.

## V.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment, is GRANTED with respect to Plaintiff's claims against the City, HHC, and Harlem Hospital and DENIED with respect to Plaintiff's claims against Officer Diaz and Defendant Doctors.  The Clerk of Court is respectfully directed to close the pending motion at Document 72.

The parties are directed to appear for a post-discovery conference on September 6, 2018 at 10:30 a.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  The parties are further directed to submit a joint letter on or before August 23, 2018, setting forth proposed trial dates and anticipated length of trial.

SO ORDERED.

Dated: July 25, 2018
       New York, New York

Vernon S. Broderick
United States District Judge